# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 27, 2010

Lyle W. Cayce
Clerk

No. 09-30186

JEREMY SONNIER,

Plaintiff - Appellant

v.

JOHN CRAIN, Dr., in his official capacity as Interim President of
Southeastern Louisiana University; JIM MCHODGKINS, Individually and in
his official capacity as Assistant Vice President for Student Affairs at
Southeastern Louisiana University; THOMAS CARMICHAEL, Individually
and in his official capacity as Police Officer for University Police Department
at Southeastern Louisiana University,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, DAVIS, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The appellant Jeremy Sonnier challenges the denial of a preliminary
injunction seeking to enjoin enforcement of the speech policy regulating the time,
place and manner, and other matters relating to speech by non-students on the
campus of Southeastern Louisiana University ("SLU"). Reviewing the district
court's denial of a facial challenge to the regulation, for the following reasons, we
AFFIRM in part and REVERSE in part.

No. 09-30186

## I.  FACTS

The appellant Sonnier and four other individuals not associated with SLU, entered the SLU campus on November 19, 2007 to express a religious message to students.  Prior to his arrival, Sonnier did not seek a permit to speak as required by the SLU speech policy.  Defendant Thomas Carmichael, an SLU police officer, asked Sonnier and the others to stop speaking until they obtained permission to continue.  Sonnier went to the office of Defendant Jim McHodgkins, the Assistant Vice President of Student Affairs.  McHodgkins informed Sonnier that, pursuant to the SLU speech policy, a permit request must be filed seven days before engaging in a public assembly or demonstration on campus.  Because Sonnier had not sought a permit seven days earlier, McHodgkins told Sonnier he would be unable to obtain permission to speak on the campus that day.  Sonnier and the other individuals left SLU's campus.  Since their departure, Sonnier has not filed an application to speak on SLU's campus and has not returned to the campus.

The SLU speech policy states generally that:

> Southeastern Louisiana University recognizes that freedom of speech and assembly are basic and essential to both intellectual and social development.  These freedoms, guaranteed by the First and Fourteenth Amendments to the United States Constitution, shall be enjoyed by the university community at Southeastern. Free discussion of ideas of either controversial or non-controversial nature shall not be curtailed.

> These freedoms, however, are not absolute.  Colleges and universities have well-established rights to regulate time, place, and manner so that activities do not intrude upon or interfere with the academic programs and administrative processes of the university. The university may designate one or more areas on campus where individuals may assemble and engage in speech activities.  All

2

No. 09-30186

speech and assembly activities must be conducted in accordance with university regulations.

The SLU speech policy then provides specific regulations governing the time,[1] place,[2] and manner[3] of speech.  The policy also provides provisions regarding

---

[1] The SLU speech policy concerning time restrictions states:

In accordance with US Federal Court decisions, the University has the right to regulate the time of speech or assembly activities.  A two (2) hour time period will be provided to individual(s) and/or organizations for these purposes at Southeastern.  Speech/assembly activities will be limited to one two hour time limit per seven-day period, commencing the Monday of each week.

[2] The SLU speech policy concerning place restrictions states:

The university has designated the following sites for public discussion and/or peaceful public assembly or demonstration: (1) the steps in front of the Student Union Annex and the grassy area immediately in front of the steps and bounded by the sidewalk; (2) the grassy area in front of the Claude B.  Pennington, Jr. Student Activity Center; (3) Presidential Plaza area north of the Student Union, as areas where public speech and assemblies may be conducted by students without prior administrative approval.  Individual(s) or organizations wishing to use such areas will be required to register the public speech or assembly a minimum of seven (7) days in advance through the office of Assistant Vice President of Student Affairs.

Public assembly, discussion or demonstration shall not disturb or interfere with any program, event, or activity approved prior to the public assembly, discussion or demonstration; shall not unreasonably disturb or interfere with normal operations and activities of the university; and will not be scheduled during other major events already scheduled on campus.  Use of the area shall not include activities which could constitute non-permissible solicitation or which would be an infraction of the university sign policy in regards to indiscriminately handing out materials to passers-by.

[3] The SLU speech policy concerning manner restrictions states:

Any individual(s) or organization may publicly assemble or demonstrate in a peaceful manner after attaining the permission of the Assistant Vice President of Student Affairs or his or her designee.

3

No. 09-30186

1.  An application to assemble publicly or demonstrate must be made seven (7) days in advance on a form provided by the Assistant Vice President of Student Affairs and shall contain:

> (a) the applicant's name, address, phone number, social security number and date of birth;
>
> (b) the proposed location, date and time for the assembly or demonstration;
>
> (c) the anticipated number of participants; including a list of authorized representatives of the organization who will be present along with their addresses, phone numbers, dates of birth, social security number and their purpose for being there, i.e. speaking, helping with set-up, etc. (ID cards will be provided to these individuals);
>
> (d) the purpose of the assembly or demonstration;
>
> (e) the signature of the applicant or, if an organization, its authorized representative.

3. [sic] The Assistant Vice President of Student Affairs shall approve an application properly made under section 2 unless there are reasonable grounds to believe that:

> (a) the applicant is under a disciplinary penalty prohibiting publicly assembling or demonstrating;
>
> (b) the proposed location is unavailable or inappropriate at the time requested;
>
> (c) the proposed date and time are unreasonable;
>
> (d) the assembly or demonstration would unreasonably obstruct pedestrian or vehicular traffic;
>
> (e) the speech will constitute a clear and present danger to the institution's orderly operation, to students, faculty or staff, or property, through advocacy of immediate action.

4.  The manner approved for the public assembly or demonstration will include but is not limited to the following conditions.

> (a) Individual(s) or organizations will be restricted to the place described in the registration and are not allowed to leave that area to conduct their assembly.
>
> (b) No harmful acts, destruction or defacement of property, or physical assaults of persons will be allowed. This includes threats and/or intimidation aimed at particular individuals and creating in them a realistic fear for their personal safety or the security of their property.
>
> (c) No use of amplification devices is allowed.
>
> (d) The speech may not be projected onto private areas, such as resident

4

No. 09-30186

payment of security fees in particular situations.[4]

On November 4, 2008, Sonnier filed an action under 42 U.S.C. §§ 1983, 1988, alleging that the SLU speech policy violates his First Amendment right to free speech.  More particularly, Sonnier challenged five provisions of SLU's speech policy: (1) the seven-day notice requirement; (2) the two-hour, once-per-week limitation; (3) the collection of personal information; (4) the security fee requirement; and (5) the limitation of speech to three specific locations.  Sonnier instituted a facial and an as-applied challenge to these provisions of SLU's speech policy, seeking injunctive and declaratory relief, as well as nominal damages.  At the time he filed his action, Sonnier also moved for a preliminary injunction restraining enforcement of the speech policy.  On March 3, 2009, after hearing arguments of counsel, the district court denied Sonnier's motion for a preliminary injunction.  Sonnier filed this timely appeal.

---

hall rooms or classrooms and thereby creating captive audiences who cannot guard their privacy by avoiding the speech.

[4] The SLU speech policy concerning security fees states:

The freedom of ideas is limited only by certain practical constraints, necessitated by such considerations as securing the safety of person and property and the need to prevent disruption of the learning environment.  The use of Southeastern Louisiana University Administration staff; University Police, city of Hammond Police, Tangipahoa Sheriffs Deputies, Louisiana State Police, or a private security company in connection with the event is at the sole discretion of the University in determining both the need for, and the strength of the security detail.  The sponsoring individual(s) or organization is responsible for the cost of this security beyond that normally provided by the University, specifically those administrators/officers who must be assigned directly to the event and/or away from their normal operational duties.

No. 09-30186

## II.  STANDARD OF REVIEW

We review the denial of a preliminary injunction for an abuse of discretion, but a decision grounded in erroneous legal principles is reviewed *de novo*. *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 418–19 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998); *Concerned Women for America, Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989).  *See also Doran v. Salemn Inn, Inc.*, 422 U.S. 922, 931–32 (1975) ("But while the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion." (citing *Brown v. Chote*, 411 U.S. 452, 457 (1973)).

A district court should issue a preliminary injunction only if the plaintiff establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury  caused by the denial of the injunction outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.  *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009).  In this appeal, the parties only dispute the first requirement; SLU does not dispute that Sonnier has met the other three requirements.  Therefore, we only examine whether the district court abused its discretion in finding that Sonnier did not have a substantial likelihood of success on the merits.

In free speech cases, the court must first determine the type of fora.  There are three types of fora: the traditional public fora, the designated public fora, and the non-public fora.  *Ark. Educ. Television  Comm'n v. Forbes*, 523 U.S. 666,

No. 09-30186

677 (1998). The parties agree that the fora in this case is either a public fora or a designated public fora. Appellant's Brief, at 18–21; Appellee's Brief, at 11. We agree. The scrutiny applied to time-place-manner restrictions is the same for both a public fora and a designated public fora. *United States v. Kokinda*, 497 U.S. 720, 726 (1990). Therefore, we need not determine whether the locations on SLU's campus that are at issue in this case are public fora or designated public fora.

Content-neutral time-place-manner restrictions are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213–14 (1997); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based time-place-manner restrictions are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1981). Sonnier acknowledges that the first, second, third, and fifth challenged provisions are content-neutral. TR at 188. Sonnier alleges the fourth challenged provision is content-based. *Id.*

Sonnier agrees that SLU has a significant interest in implementing a speech policy that promotes education and minimizes disruptions to the academic setting. TR at 189. Sonnier's central objection to the policy is that it is not narrowly tailored to serve SLU's interest. We agree that SLU has a strong interest in promoting education. Therefore, we only examine whether the district court abused its discretion in finding that the speech policy was narrowly tailored to serve SLU's interest.

A restriction is narrowly tailored when it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 798–99. "In the context of intermediate scrutiny, narrow tailoring does not require that the least restrictive means be used. As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *SEIU v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ward*, 491 U.S. at 798 (1989)). "What constitutes a reasonable, narrowly tailored regulation depends on a variety of factors, including the character of the place in which the regulation is enforced." *Id.* at 599. Thus, we examine all of the restrictions at issue in the context of the location where they are to be enforced: a college campus.

## III. SCOPE OF APPEAL

Sonnier argues that the district court erred in denying both his facial challenge to the SLU speech policy and his as-applied challenge. The defendants argue that the district court, without objection from the parties, adopted a trial plan to consider only the facial challenge in its consideration of the preliminary injunction and defer consideration of the as-applied challenge until the evidentiary hearing on the permanent injunction that is scheduled for February 2010.

Under FED. R. CIV. P. 65(a), a district court has broad discretion in deciding whether to consolidate a preliminary injunction with the hearing of the motion for the permanent injunction. *See Dillon v. Bay City Constr. Co.*, 512 F.2d 801, 804 (5th Cir. 1975). "The rule permits the Trial Judge to flexibly

No. 09-30186

merge and hear the component parts of a case thereby avoiding repetition and unnecessary delay." *Id.*

Although in this motion for preliminary injunction Sonnier brought both a facial challenge and an as-applied challenge, the district court's trial plan is evident in the court's comments throughout the hearing on the preliminary injunction. The court began the hearing on the motion for preliminary injunction by asking a number of preliminary questions to counsel, including questions about what occurred just before Sonnier was escorted from the campus. Thereafter the court stated:

> It sounds like you all have some key factual issues that are in dispute as to what occurred here when Mr. Sonnier went on campus as well as some other issues that maybe pertinent for a resolution of the constitutional questions, particularly as regards to perhaps application and the execution of this policy, *but I'm dealing here with the policy on its face.* While you concede that it maybe content neutral on its face, I haven't heard an argument that it's applied, at least, because you haven't gone into discovery yet on this, whether it's applied just to say religious groups or certain groups as opposed to others. . . . It seems as if there's some facts that need to be determined here to resolve this particular case.

Transcript Record ("TR") at 220–21 (emphasis added).

The court, in its ruling, then stated:

> . . . I don't find that here the policy of the university, or at least the present set of facts that I have before me, would justify the in [sic] granting a preliminary injunction. I would require further discovery on its execution, as well as on the actual circumstances surrounding this incident, because there's differences of opinions on the facts here as presented on what occurred that day with Mr. Sonnier and campus officials. So it will require further discovery, but on its face it's content neutral, the policy that is.

9

No. 09-30186

I make a preliminary finding that it does not appear to violate
First Amendment issues insofar as the policy itself on its face.

* * * * * * * * *

In denying the preliminary injunction request, however, we reserve
the right to revisit all of these particular issues as further facts are
developed, but on its face I don't find that there's a basis at this time
for the issuance of a preliminary injunction.

*Id.* at 228–29.

Sonnier never objected during the hearing to the district court's decision
to proceed to hear the facial challenge. Although there is no express agreement
in the record by Sonnier to limit the hearing to a facial challenge, Sonnier's
counsel did announce at the beginning of the hearing that he had no witnesses
to present and it's clear from the record that Sonnier had conducted little or no
discovery.[5] In fact, Sonnier resisted providing initial rule 26 discovery requested
by the defendants.

In sum, Sonnier gave no indication to the court that his focus at the
preliminary injunction hearing was on anything other than the facial challenge
consistent with the judge's announcement that this was the sole issue that it
intended to resolve at the hearing. This is consistent with Sonnier's motion to
stay proceedings in the district court pending appeal where he stated:

The issues of this case depend heavily on disputes of law, not of fact.
The primary challenge to SLU's policy in this case is a facial
challenge. Thus, the Fifth Circuit will address purely legal issues
to determine the likelihood of plaintiff's success on the merits. And,

---

[5] For example, Sonnier had no discovery or evidence designed to show why the
University's regulations were not narrowly tailored or how the regulations could be more
narrowly drawn and still serve the University's legitimate purposes.

No. 09-30186

once the Fifth Circuit speaks to the meaning of the law, the case would essentially be resolved.

Given the position of the parties at the hearing, the court was justified in addressing only the facial challenge to SLU's regulations at the hearing on the preliminary injunction and waiting to address the as-applied challenge until the hearing on the permanent injunction.

Therefore, on appeal, we only review the district court's denial of a preliminary injunction for Sonnier's facial challenge, reserving the right of Sonnier to present evidence to support his as-applied challenge and his facial challenge at the upcoming hearing on the permanent injunction.

## IV.  ANALYSIS

"A facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid." *U.S. v. Salerno*, 481 U.S 739, 745 (1987).[6] *See U.S. v. Stevens*, 2010 U.S. LEXIS 3478, at \*22 (2010) (stating that the *Salerno* standard is a standard used to succeed in a typical facial attack). A facial challenge will fail when the statute has a "plainly legitimate sweep."

---

[6] In the First Amendment context, a challenger may also succeed by establishing that the regulation is impermissibly overbroad because a substantial number of its applications are unconstitutional. *Wash. State Grange*, 128 S.Ct. at 1191 n.6; *New York v. Ferber*, 458 U.S. 747, 769 (192). In this case, however, Sonnier stated during appellate oral argument that this was a "regular" facial challenge and not an overbreadth facial challenge. *See also* Appellant's Reply Brief, at 2–3 (discussing the differences between a facial challenge and a facial overbreadth challenge). Moreover, a challenger may only bring either an as-applied challenge or an overbreadth challenge, but he may not bring both. *See Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003). Because Sonnier brought an as-applied challenge that is still pending before the district court, he cannot argue an overbreadth challenge on appeal.

No. 09-30186

*Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in judgments).  The Supreme Court has explained why abstract facial challenges are disfavored:

> Facial challenges are disfavored for several reasons.  Claims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records."  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.  We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"

*Wash. State Grange v. Wash. State Republican Party*, 128 S.Ct. 1184, 1191 (2008) (citations omitted).  The Court expressed similar sentiments in *Sabri v. U.S.*, 541 U.S. 600, 608–09 (2004) (citations omitted): "[F]acial challenges are best when infrequent.  Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks."

We examine each of the challenged provisions separately.

A.

Sonnier argues first that the requirement that an application to assemble or demonstrate be made seven days in advance is not narrowly tailored.  The defendants argue that the seven-day notice requirement is permissible because

12

public universities have duties and responsibilities that require such advanced notice.

In *Bowman v. White*, the Eighth Circuit reviewed the district court's ruling on a facial, overbreadth, and as-applied challenge to the validity of a university's three-day notice requirement. The court stated that the "modest nature" of a three-day notice requirement for public speeches, combined with the "University's reduced capacity to address 'the exigencies of determining what, if any, security, crowd control, additional insurance, etc., will be required for a particular event," made the notice requirement "sufficiently narrowly tailored." 444 F.3d 967, 982 (8th Cir. 2006) (citations omitted). In finding the three-day notice requirement constitutionally permissible, the Eighth Circuit specifically distinguished University settings from other public forums. The *Bowman* court distinguished its case from the earlier case of *Douglas v. Brownell*, 88 F.3d 1511, 1523–24 (8th Cir. 1996), in which the court struck down a five-day notice requirement to picket or parade in city streets. The *Bowman* court found its case differed from *Douglas* because the forum in *Bowman* was a college campus whereas the forum in *Douglas* was a city street. *Bowman*, 444 F.3d at 982. The *Bowman* court explained that "a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice." *Id.*

The Fourth Circuit has similarly stated that universities have unique, particular concerns that must factor into a court's review of the university's speech policy. *See ACLU Student Chapter v. Mote*, 423 F.3d 438, 445 (4th Cir. 2005) (allowing the University of Maryland to require non-students to reserve a spot to speak or distribute leaflets up to five days in advance); *Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir. 1985) (stating that "[a] college has a right to

preserve the campus for its intended purpose and to protect college students from the pressures of solicitation").

We agree with the distinction drawn by the Fourth and Eighth Circuits. Universities are less equipped than cities and other public fora (or designated public fora) to respond to disruptions on short notice. Providing a university with advance notice allows the university to adequately take care of any issues associated with the public speech or demonstration that might hamper the university's ability to meet its primary goal — the education of its students.

Sonnier argues that "concerns over traffic, crowd control, property maintenance, or the public welfare do not justify long notice requirements." However, he cites no case concerning a college campus that makes this assertion. Instead, the cases cited by Sonnier relate to notice requirements for speech on city streets and public parks. *See, e.g., Sullivan v. City of Augusta*, 511 F.3d 16, 38–40 (1st Cir. 2007) (striking down a thirty-day notice requirement for parades on city streets); *Douglas*, 88 F.3d at 1523–24 (striking down a five-day notice requirement for parades and pickets on city streets); *Grossman v. City of Portland*, 33 F.3d 1200, 1204–08 (9th Cir. 1994) (striking down a seven-day notice requirement for public speeches and demonstrations in public parks). Because public universities have different needs and limitations than cities, the cases cited by Sonnier are not controlling in this case.

Additionally, Sonnier objects to the seven-day notice requirement because there is no small group or individual exception. Sonnier argues that under Fifth Circuit precedent, "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006). But these

No. 09-30186

also only relate to cities and not to universities.  *See, e.g., American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (requiring a small group exception for a permit to hold a special event in the City of Dearborn); *Cox v. City of Charleston*, 416 F.3d 281, 284–86 (4th Cir. 2005) (requiring a small group exception for a permit to hold a gathering in the City of Travelers Rest).  Both the Eighth Circuit and the Second Circuit have not required an individual or small group exception for advanced-notice requirements on university campuses.  *See Bowman*, 444 F.3d at 982; *Powe v. Miles*, 407 F.2d 73, 84 (2d Cir. 1968).  In fact, in *Bowman*, the Eighth Circuit upheld the permit requirement even when the speaker was a single, traveling street preacher, much like Sonnier.[7]

We acknowledge that the seven-day notice requirement is longer than notice requirements considered by other circuits, but this modest increase in length does not lead us to conclude that the regulation is not narrowly tailored for Sonnier's facial challenge.  In order to succeed in a facial challenge, the plaintiff must establish the regulation would be invalid in all circumstances.  *Wash. State Grange*, 128 S.Ct. at 1191.  There are situations in which  a seven-day notice may well be required.  If Sonnier expected to attract a large number of students with his message, SLU might need the entire seven days to logistically prepare for Sonnier's arrival.[8]  If Sonnier desired to speak on SLU's

---

[7] The *Bowman* court noted that the speaker drew crowds when he spoke, sometimes as large as 200 students, but the permit requirement was placed on the speaker alone, regardless of the number of students he expected.

[8] Sonnier's counsel even stated at the hearing on the preliminary injunction that "if they were applying for a group of a hundred people that want to come and speak on campus you would need time to prepare adequately for that."  TR at 194.

15

No. 09-30186

campus at the same time as a number of other individuals and organizations wished to speak on SLU's campus, SLU might need the entire seven days to organize when each individual would speak. If Sonnier or another speaker wished to speak at a time when multiple members of the SLU administration were scheduled to be out of the office, SLU might need the entire seven days to coordinate who would attend the event. Given that there are instances in which the seven-day notice requirement may be necessary, the district court did not abuse its discretion in denying the preliminary injunction for the facial challenge of the seven-day notice requirement.[9]

### B.

Next, Sonnier argues that limiting the amount of time an individual or organization may speak on campus to two hours, once per week, is not narrowly tailored. He compares the regulation to a provision that was struck down in *Bowman*. The defendants distinguish the SLU regulation from the *Bowman* provision by arguing that the SLU regulation is less restrictive.

In *Bowman*, reviewing the district court's ruling on a facial, overbreadth, and as-applied challenge, the court struck down a provision that limited a person's ability to speak on a college campus to five days per semester because the provision was not narrowly tailored. 444 F.3d at 981–82. The Eighth Circuit found that while a university had a significant interest in fostering a diversity of viewpoints and preventing one speaker from monopolizing space on the

---

[9] Sonnier will have the opportunity to produce evidence at the hearing for the permanent injunction that demonstrates the seven-day notice requirement is not narrowly tailored as applied to him, and the defendants will have to justify why, as applied to Sonnier, the requirement is narrowly tailored.

No. 09-30186

campus, the provision was not narrowly tailored to achieve those interests. *Id.* at 982.

We agree with the defendants that the SLU policy is less restrictive than the policy at issue in *Bowman*. While the *Bowman* policy restricted speakers to speaking five times per semester, the SLU regulation allows speakers to speak sixteen times per semester.

More importantly, however, Sonnier has not demonstrated that the SLU regulation is invalid in all circumstances. There are situations in which limiting the number of times an individual speaks on campus and the length of time an individual speaks on campus are valid means for SLU to protect its legitimate interests. If a large number of individuals or organizations wish to speak on campus during the same week, the University must have a non-discriminatory manner of granting permission to as many diverse speakers as possible. By restricting all of the speakers to two hours per week, the University can better ensure that the greatest number of different individuals and organizations are able to deliver their message on campus. Accordingly, we find the district court did not abuse its discretion in denying Sonnier's facial challenge to this regulation.

C.

Next, Sonnier asserts that requiring an applicant to disclose personal information about himself or herself is not narrowly tailored to achieve SLU's interest. The defendants contend that requiring the disclosure of personal information about speaker applicants is necessary to address public safety concerns and ensure broad access to the University.

17

No. 09-30186

Other circuits have allowed public entities, including universities, to require a speaker to provide personal information to obtain a permit. *See Bowman*, 444 F.3d at 980–81 (upholding a requirement that speakers obtain a permit on a college campus); *Hobbs v. County of Westchester*, 397 F.3d 133, 150–51 (2d Cir. 2005) (upholding a requirement that people planning to use props and/or equipment during performances in a public forum obtain a permit); *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004) (upholding a state statute that required applicants for outdoor gatherings to submit, among other things, their name, address, estimated attendance, and nature of the proposed gathering). Sonnier cites *Watchtower Bible and Tract Society of New York v. Village of Stratton*, 536 U.S. 150, 166–67 (2002), for the proposition that he has the right to speak anonymously. *Watchtower*, however, held that a village could not require a door-to-door distributor of handbills to register with the Mayor's office before canvassing private homes. We agree with Sonnier that the Court has found anonymous door-to-door pamphleteering to be protected by the First Amendment. However, Sonnier is *not* engaging in door-to-door pamphleteering on private property; Sonnier is speaking on a public university's campus. Therefore, we find the cases concerning permit requirements to speak in public forums more instructive than *Watchtower*.

The SLU policy requires the applicant's name, address, phone number, social security number, date of birth, proposed location, date, and time of the speech, anticipated number of participants, and purpose of the assembly. We agree with the defendants that this regulation is narrowly tailored to their significant interest for Sonnier's facial challenge. By knowing the identity of speakers on campus, where they intend to speak, and their purpose, the

18

No. 09-30186

University is better equipped to ensure that necessary safety and security precautions are taken. Also, obtaining information regarding the future speech allows the University to take any steps required in advance to continue normal education functions during the speech. While there may be circumstances in which all of the information requested by SLU is not narrowly tailored, Sonnier has not demonstrated that in every instance this regulation is invalid. Therefore, the district court did not abuse its discretion in denying the preliminary injunction for this permit requirement.

D.

Sonnier argues next that SLU's speech policy violates the First Amendment because it gives the University the "sole discretion . . . in determining both the need for, and the strength of the security" at the public assembly or demonstration, and assesses the cost of additional security on the sponsoring individual or organization. In response, the defendants assert that the fee has never been charged. Regardless of whether the fee has ever been charged, we agree with Sonnier.

In *Forsyth County v. Nationalist Movement*, the U.S. Supreme Court struck down a virtually identical security fee provision that required organizations to pay for "the cost of necessary and reasonable protection [for assemblies] . . . [that] exceeds the usual and normal costs of law enforcement . . . ." 505 U.S. 123, 126 (1992). The *Forsyth County* Court found the security fee unconstitutional because, among other reasons, the regulation included no objective standards directing how to establish the level of the fee. Instead, the amount of the security fee was left to the "whim of the administrator." *Id.* at 133.

No. 09-30186

The SLU security fee provision has the same shortcomings as the ordinance struck down in *Forsyth County*. As the policy states, determining the additional amount of security needed is at the "sole discretion" of the University; no objective factors are provided for the University to rely upon when making such a determination.[10] Because of the unbridled discretion this provision gives to the University, we conclude that the district court abused its discretion in denying a preliminary injunction with regards to the security fee.

E.

Sonnier finally contends that the requirement that all assemblies and demonstrations must occur in three specific on-campus venues is an overly broad restriction of speech. Further, Sonnier argues that the SLU's speech policy unconstitutionally bans him from speaking on the campus' sidewalks. The defendants argue that the policy does not prohibit Sonnier from speaking on the University's sidewalks and that limiting the geographic area for non-students to speak and assemble is proper.

Our reading of SLU's speech policy is consistent with the defendants reading of the policy: nothing in the policy prohibits Sonnier from walking on the sidewalks of the SLU campus and speaking to students. The policy simply precludes group demonstrations and assemblies from occurring on the University sidewalks. The University obviously has a significant interest

---

[10] The defendants also cite *Cox v. New Hampshire*, 312 U.S. 569 (1941) for the proposition that a government may impose fees on speakers for the expenses incident to speech. The defendants, however, misread *Forsyth County*'s interpretation of *Cox*. In *Forsyth County*, the Court distinguished *Cox* because "there was in *Cox* no testimony or evidence that the statute granted unfettered discretion to the licensing authority," whereas in *Forsyth County*, as in this case, there was evidence that the administrator of the fees in question had unbridled discretion to set the fees. *See Forsyth County*, 505 U.S. at 133 n.11.

No. 09-30186

keeping its sidewalks and streets open to allow students and others access to the campus.

"The courts reject the proposition 'that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." *Gilles v. Blanchard*, 477 F.3d 266, 470 (citing *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). *See also A.C.L.U. v. Mote*, 423 F.3d 438, 445 (4th Cir. 2005) (holding that a university may require outside speakers to speak from particular, pre-scheduled locations on campus). Undoubtedly, SLU has a significant interest in preserving its property for educational purposes and limiting where outside speakers may assemble or demonstrate is narrowly tailored to that purpose. *See Adderly v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Bowman*, 444 F.3d at 978 ("[A] university's mission is education and the search for knowledge — to serve as a 'special type of enclave' devoted to higher education. Thus, streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus.").

We find no authority — and Sonnier provides none[11] — that requires a public university to throw open its entire campus for public assemblies or

---

[11] None of the cases that Sonnier cites address the question presented here, namely whether a public university may limit public speech to particular areas on the campus. Instead, the cases Sonnier cites discuss whether particular areas of college campuses constitute a public fora. These cases do not stand for the proposition that a college campus must allow non-students to assemble or demonstrate on all areas of the campus.

21

No. 09-30186

demonstrations. The district court did not abuse its discretion in denying a preliminary injunction as to the location limitations for where a speaker may address the students.

CONCLUSION

For the above reasons, we AFFIRM the district court's order denying the preliminary injunction on Sonnier's facial challenge to the following provisions on the SLU speech policy: (1) the seven-day notice requirement, (2) the two-hours, once-per-week limitation, (3) the collection of personal information, and (4) the limitation of speech to three specific locations. We REVERSE the district court's order denying the preliminary injunction with regard to SLU's security fee requirement, and grant the preliminary injunction restraining defendants from enforcing this portion of the speech policy.

Affirmed in part.

Reversed in part.

No. 09-30186

DENNIS, Circuit Judge, concurring in part and dissenting in part.

I concur in one part of the majority opinion — section IV.D — which holds that the security fee provision of Southeastern Louisiana University's (SLU) policy on speech and assembly is facially unconstitutional, but I respectfully dissent from the rest of the majority opinion, which upholds the other challenged provisions of the SLU speech policy as facially constitutional. In my view, those other provisions of the SLU speech policy were unconstitutionally applied to the plaintiff, an itinerant Christian gospel teacher, when SLU police and administrative officers ordered him to stop his attempts to engage university students in religious conversations on a campus thoroughfare.

Several basic errors permeate the decisions of the district court and the majority. First, the district court and the majority erroneously reach and decide the plaintiff's facial challenge to the SLU speech policy without first deciding whether the plaintiff's as-applied challenges have merit. Second, the majority adopts as binding precedent a misconception of what makes a law facially invalid under the First Amendment. The majority erroneously sees the facial invalidity inquiry as a simple all-purpose "no set of circumstances" test, under which a plaintiff can prevail in a facial challenge only if the court is unable to imagine even a single set of circumstances under which the law or regulation at issue could survive an as-applied challenge. Although the Supreme Court has adverted to that test in dicta, it has never relied on it in deciding a facial challenge. In fact, the "no set of circumstances" test is contradicted by the holdings and reasoning of a substantial and growing number of Supreme Court and Fifth Circuit cases. Moreover, the use of a

23

single test that supposedly applies to all facial challenges appears to be incompatible with the Supreme Court's recent explanation in *Citizens United v. FEC*, 130 S. Ct. 876 (2010), that "the distinction between facial and as-applied challenges" has no "automatic effect" on the "pleadings and disposition" of a case. *Id.* at 893.

Finally, the majority fails to properly apply the constitutional test required by the Supreme Court in *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and applied by this circuit in *Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006). As the Court in *Ward* stated:

> Our cases make clear . . . that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Although it appears undisputed that the SLU speech policy is a set of content-neutral restrictions on the time, place, or manner of speech in a public forum, SLU has not shown by the record in this case that its restrictions are narrowly tailored to serve a significant governmental interest. Thus, the challenged restrictions — which require even small groups and individuals to seek the government's permission seven days in advance of speaking in public, to entrust significant personal information to SLU, and to speak for no more than two hours per seven days — are unconstitutional, at least as applied to the plaintiff's speech in this case.

No. 09-30186

## I. The Plaintiff's As-Applied Challenge

The majority errs by treating this appeal as involving a purely facial challenge.  This case began when Southeastern Louisiana University (SLU) applied certain provisions of its official policy on speech and assembly to Jeremy Sonnier, the plaintiff-appellant.  Sonnier is a Christian preacher who stood in a pedestrian mall on SLU's campus along with a handful of friends, holding a sign, and tried to start conversations about religion with individuals who passed by.  Sonnier's sworn account of these events is undisputed in the record, and there is no evidence that he tried to give a public speech to an audience, nor that he disrupted classes, blocked foot traffic, or in any way incited unrest or disorder.  Sonnier was accosted by a campus police officer who told him that he could not speak because "people here" disagreed with him.  He was threatened with arrest, prevented from conversing with passersby, and told that he could not speak in this manner without first getting permission from a university official.

Officer Carmichael told Sonnier that he would be arrested unless he discontinued all expressive activity.  He told Sonnier that there had been "complaints" and that he was considered "disruptive . . . because there are people here who are not agreeing with you."  He further explained that "when your speech becomes offensive to other people, then it becomes a problem."  When asked to explain how holding a sign or trying to engage in conversation on an open mall could be disruptive to education, the officer could not do so.

Sonnier was then taken to the office of Jim McHodgkins, Vice-President of Student Affairs, who supported Officer Carmichael's comments and actions and refused to give Sonnier permission to speak on campus that day.  Sonnier

25

No. 09-30186

and his friends then left the campus for fear of arrest. In denying Sonnier permission to speak, McHodgkins relied on SLU's "University Policy on Public Speech, Assembly and Demonstrations" (referred to as "the SLU speech policy" or "the SLU policy" throughout this dissent).

Those are the events out of which this lawsuit arose. Sonnier is challenging SLU's restrictions on speech, not merely because he has an abstract disagreement with them, but because he contends that the SLU speech policy was applied to him in a way that unconstitutionally burdened, and continues to burden, his First Amendment rights. By bringing this case, he seeks to establish that he can, without seeking permission seven days in advance and complying with other SLU's restrictions, walk or stand around the campus, carry a sign, and have conversations with individual students — the actions for which he was threatened with arrest by a campus police officer with the support of a senior university official.

This constitutional challenge, therefore, is not "purely facial" in any meaningful sense. It has been an as-applied case from the very beginning. Along with his complaint, Sonnier filed a motion for a preliminary injunction and provided summary judgment–type evidence in support of that motion, consisting of an affidavit setting out the facts as stated above; a copy of the SLU speech policy; and a map of the SLU campus. His memorandum in support of the motion for a preliminary injunction included several pages of arguments that specifically explained how SLU's restrictions on speech "adversely impact Sonnier and his expression."

About four months after Sonnier filed his motion for a preliminary injunction, the district court heard oral argument on that motion. During

No. 09-30186

that four-month period, the government did not provide any evidence whatsoever; thus, Sonnier's account of how the SLU policy had been applied to him was uncontested. During oral argument, Sonnier's counsel continued to explain that the SLU policy's application to Sonnier was unconstitutional. For example, at one point the judge asked whether the policy applied to one-on-one conversations as well as to speeches delivered to an audience. Sonnier's counsel replied, "I think that's confirmed by actual application to Mr. Sonnier. He was there and attempted to engage in one-on-one conversation. . . . [H]e attempted to engage in a one-on-one dialogue with one student about theological points and the officer said that he could[n't][1] do that until he obtained permission from the university."

The record on appeal thus contradicts the majority's assertion that "Sonnier gave no indication to the court that his focus at the preliminary injunction hearing was on anything other than the facial challenge."[2] Maj. Op. 10. But the district court, despite Sonnier's written and oral explanations of why the SLU speech policy was unconstitutional as applied to him, decided

---

[1] The transcript says "could," not "couldn't," but the context makes it clear that Sonnier's counsel must have said (or intended to say) "couldn't."

[2] The majority opinion notes that Sonnier did not conduct any discovery, but it does not explain why Sonnier should have conducted discovery. He already knew from personal experience how the SLU policy had been applied to him.

Likewise, there is no apparent reason why Sonnier should have called witnesses at the preliminary injunction hearing. He had already given his account of the events giving rise to the lawsuit in his uncontradicted affidavit which had been filed four months earlier.

The majority implies that Sonnier did something wrong when he "resisted providing initial Rule 26 discovery requested by the defendants." Maj. Op. 10. However, assuming for the sake of argument that this is true (although the district court did not rule on any discovery disputes), the majority does not explain how ignoring all of Sonnier's as-applied arguments could be an appropriate sanction for any such misbehavior.

No. 09-30186

to focus solely on the facial aspects of Sonnier's arguments.  The court made what it described as "a preliminary finding that it does not appear to violate First Amendment issues insofar as the policy itself on its face" and denied the motion for a preliminary injunction.

This was erroneous for two reasons.  First, it should be self-evident that a party bringing a motion for a preliminary injunction has the right to make any relevant legal argument in support of that motion.[3]  Among the prerequisites for a preliminary injunction is that the moving party must establish "a substantial likelihood of success on the merits."  *E.g.*, *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009). In order to show such a likelihood of success, a plaintiff who seeks a preliminary injunction because he believes a governmental restriction on speech is unconstitutional as applied to him has to make the argument that the restriction is unconstitutional as applied.  If a court simply ignores all as-applied arguments, then the plaintiff is prevented from using those arguments to demonstrate his likelihood of success on the merits.  The

---

[3] It is helpful to clarify that, as the Supreme Court has recently explained, facial and as-applied challenges are not really separate *claims*, but are merely different *arguments* in support of the claim that the plaintiff's constitutional rights have been violated.  In *Citizens United v. FEC*, 130 S. Ct. 876 (2010), the Court explained that Citizens United's facial challenge — in which it asked the Court to overrule *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) — was "not a new claim," but was only "a new argument" in support of Citizens United's already-existing "claim that the FEC ha[d] violated its First Amendment right to free speech."  *Citizens United*, 130 S. Ct. at 893.

Likewise, in the instant case, Sonnier's facial and as-applied challenges are not separate claims, but are merely different arguments in support of Sonnier's claim that SLU has violated his First Amendment right to free speech.  Thus, it is proper to refer to Sonnier's "as-applied arguments" as I do here.

See section II.B below for a more extended discussion of the significance of *Citizens United*.

28

No. 09-30186

plaintiff is therefore denied injunctive relief to which he may be entitled, without having been afforded any real opportunity to explain why he is entitled to it.[4]

The fact that the district court intended to hear as-applied arguments at a later stage of this case does not excuse the failure to consider them at the preliminary injunction stage. Even if the district court will eventually be willing to listen to those arguments, it has already ignored them at a critical stage of this case, even though they were plainly relevant to whether Sonnier was entitled to a preliminary injunction. The denial of a preliminary injunction is, in itself, a substantial and unnecessary denial of Sonnier's constitutional rights. "It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

---

[4] The majority cites Fed. R. Civ. P. 65(a) and *Dillon v. Bay City Construction Co.*, 512 F.2d 801, 804 (5th Cir. 1975), for the proposition that the district court acted within its discretion. Maj. Op. 8-9. However, these authorities are irrelevant; neither of them comes anywhere close to permitting a district court to ignore as-applied arguments and entertain only facial arguments for a preliminary injunction. Rule 65(a) states that "the court may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing," but the district court did not do anything like that in this case; rather, it held a preliminary injunction hearing but refused to consider as-applied arguments.

In *Dillon*, this court held that a district court had abused its discretion by consolidating a preliminary injunction hearing with a trial on the merits in a way that "inhibited altogether the extensive discovery and investigation necessitated by this kind of class action and to which the plaintiffs had a right under [Rule] 26." 512 F.2d at 804. If anything, *Dillon* favors the plaintiff in this case: it stands for the principle that it is an abuse of discretion for a district court to structure its proceedings in a way that prevents a party from fully presenting its case. At any rate, the district court in this case did not consolidate the preliminary injunction hearing with the trial on the merits, so *Dillon* and Rule 65(a) are irrelevant.

The second reason why the district court erred by choosing to consider only facial and not as-applied arguments is that such an approach to deciding cases is directly contrary to the Supreme Court's repeated pronouncements that as-applied challenges are to be favored over facial ones. "[F]acial challenges are best when infrequent. Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)) (second alteration in *Sabri*) (citations omitted). *See also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (giving "several reasons" why "[f]acial challenges are disfavored").

If facial challenges are disfavored, then when a plaintiff argues that a law is unconstitutional both on its face and as applied, courts ought to start by addressing the as-applied arguments. That approach allows us to focus on "the lessons taught by the particular, to which the common law method normally looks." *Sabri*, 541 U.S. at 609. The district court here did just the opposite. Sonnier provided an affidavit detailing the facts of the incident in which the SLU speech policy was applied to him; the government offered no countervailing evidence. Yet, rather than focusing on the particular facts of the event that gave rise to this lawsuit, the district court considered only the policy on its face.

No. 09-30186

Because the district court erred in this way, our court should either address Sonnier's as-applied arguments or else vacate the district court's order denying a preliminary injunction and remand the case for the district court to consider those arguments in the first instance. We can reach Sonnier's as-applied arguments on appeal because they are not waived: Sonnier made them before the district court, even though they were ignored, and his appellate briefs are also replete with as-applied arguments. There is no good reason for this court to follow the district court's error in treating this case as if it involved a purely facial challenge.

## II. Facial Challenges and Intermediate Scrutiny

The majority opinion is predicated not only on the mistaken premise that this appeal involves an exclusively facial challenge, but also on the erroneous belief that there is one single test that must be used to resolve essentially[5] all facial challenges regardless of subject matter. According to the majority, that test is the "no set of circumstances" test, under which a plaintiff can prevail only if the court cannot imagine even a single set of circumstances under which the law or regulation at issue could survive an as-applied challenge. The majority's reliance on that test is erroneous for three principal reasons.

First, the idea that there is a single test for all facial challenges is contradicted by the Supreme Court's explanation in *Citizens United v. FEC* that the facial/as-applied distinction does not have "some automatic effect" or

---

[5] In the majority's view, there is one narrow exception to this rule: challenges involving the overbreadth doctrine in the context of the First Amendment. Maj. Op. 11 n.6. That exception is not relevant here, since Sonnier's arguments do not rely on that doctrine.

31

"control the pleadings and disposition in every case involving a constitutional challenge." 130 S. Ct. 876, 893 (2010). Second, the "no set of circumstances" test is incompatible with the test that actually does determine the constitutionality of the content-neutral time-place-manner speech restrictions that are challenged in this case — namely, intermediate scrutiny, as defined in cases like *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and *Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006). Third, the Supreme Court and the Fifth Circuit have repeatedly disregarded or rejected the "no set of circumstances" test in a variety of circumstances, due to its incompatibility with numerous substantive constitutional doctrines and tests such as the *Lemon* test, the vagueness doctrine, and intermediate scrutiny.

For these reasons, even if it were true that this appeal involves a purely facial challenge, the "no set of circumstances" test on which the majority relies would still be the wrong test to apply. The way to determine whether the challenged provisions of the SLU speech policy are constitutional is to apply intermediate scrutiny — that is, to decide whether they are narrowly tailored to serve a significant government interest.

## A. *The majority's reasoning relies on the "no set of circumstances" test, and not on intermediate scrutiny.*

Although the majority seems to acknowledge that intermediate scrutiny is the applicable test in this case, Maj. Op. 7-8, its reasoning ultimately relies instead on the "no set of circumstances" test. The majority holds that the challenged provisions of the SLU speech policy are facially constitutional (except for the security fee provision) because the majority is able to imagine

situations in which those provisions would survive as-applied challenges. According to the majority, "there are instances in which the seven-day notice requirement may be necessary" and therefore that requirement is facially constitutional. Maj. Op. 15. The majority likewise concludes that the limitation of speech to two hours per seven days is facially constitutional because "Sonnier has not demonstrated that the SLU regulation is invalid in all circumstances" and "[t]here are situations in which limiting the number of times an individual speaks on campus and the length of time an individual speaks on campus are valid means for SLU to protect its legitimate interests." Maj. Op. 16. And the majority holds that the personal information disclosure requirement is facially constitutional because "[w]hile there may be circumstances in which all of the information requested by SLU is not narrowly tailored, Sonnier has not demonstrated that in every instance this regulation is invalid." Maj. Op. 18.

Thus, the test that determines the outcome the majority reaches is the "no set of circumstances" test. The majority's line of reasoning is that because it is possible to imagine some set of circumstances in which each of these restrictions on speech would survive an as-applied challenge (for example, "[i]f Sonnier or another speaker wished to speak at a time when multiple members of the SLU administration were scheduled to be out of the office," Maj. Op. 15), all of the restrictions are therefore facially constitutional. In other words, under the majority opinion's reasoning, if one situation can be imagined in which a particular restriction on speech would be justified, that is enough to uphold a restriction which applies to *all* situations.

No. 09-30186

Although it sometimes mentions intermediate scrutiny and narrow tailoring, the majority opinion does not apply intermediate scrutiny to the challenged speech restrictions. That is, it makes no attempt to determine whether each of the restrictions is narrowly tailored to serve a significant government interest, either as written or as applied to Sonnier. The majority does not determine whether each restriction "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Knowles*, 462 F.3d at 434 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)) (internal quotation mark omitted). Nor does it consider whether "'a substantial portion of the burden on speech does not serve to advance' the [restriction's] stated goals." *Id.* (quoting *Ward*, 491 U.S. at 799). Nor does it ask whether each restriction "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Instead, the majority merely imagines hypothetical situations and decides that such imaginings are sufficient to facially justify SLU's restrictions on speech.

The majority's "no set of circumstances" test thus hardly amounts to scrutiny at all. It puts a practically insurmountable barrier in the path of Sonnier's challenge to the facial constitutionality of these governmental limitations on speech.[6] But my objection to the majority's use of the "no set of

---

[6] Interestingly, the majority does *not* apply the "no set of circumstances" test to SLU's security fee provision, which it holds is facially unconstitutional. Maj. Op. 18-19. Instead, it recognizes (and I agree) that this provision is indistinguishable from the ordinance that the Supreme Court struck down in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992). However, if the majority were to apply the "no set of circumstances" test to the security fee provision, it would have to conclude that the provision is facially constitutional because it is possible to imagine a circumstance in which SLU might set a security fee that would be justifiable — for instance, a nominal fee for security for a large concert. The majority holds that this speech restriction is facially unconstitutional without regard to the "no set of circumstances" test, but it nonetheless holds that all the other challenged restrictions are

circumstances" test is not only that it has the practical effect of making facial challenges futile. Rather, the most important problem with the "no set of circumstances" test is that it is an incorrect statement of the law: as I explain below, it is contradicted by numerous Supreme Court and Fifth Circuit cases concerning facial challenges and intermediate scrutiny, and it is ultimately based on nothing more than a controversial dictum in one case.

## B. The Supreme Court in Citizens United *has explained that the distinction between facial and as-applied challenges has no automatic effect; this contradicts the mistaken idea that virtually all facial challenges are governed by the "no set of circumstances" test.*

The majority's stated reason for applying the "no set of circumstances" test is solely that this case involves (in the majority's view) a purely facial challenge. Maj. Op. 11-12. Thus, the majority relies on a test that supposedly applies to all facial challenges, regardless of what type of law is being challenged. However, the Supreme Court has recently clarified that it is erroneous to make this kind of sharp, categorical distinction between the methods for adjudicating facial and as-applied challenges: "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 130 S. Ct. 876, 893 (2010).[7]

---

facially constitutional because the plaintiff cannot meet that test.

[7] All nine Justices (five in the majority and four dissenters) agreed with this statement. *See Citizens United*, 130 S. Ct. at 935 n.9 (Stevens, J., dissenting) (expressly agreeing that "the

No. 09-30186

The real significance of the facial/as-applied distinction, the Court explained, is that "it goes to the breadth of the remedy employed by the Court." *Id.* In other words, the facial invalidation of a statute is a broader remedy than as-applied invalidation. A facial challenge is an argument asking the court to hold that a particular law can never be validly enforced, whereas an as-applied challenge is an argument asking the court to hold that a law cannot be enforced in some particular set of circumstances.[8] In this

---

distinction between facial and as-applied challenges does not have 'some automatic effect' that mechanically controls the judicial task"). *See also id.* at 919 (Roberts, C.J., concurring) (further discussing the unimportance of the distinction between facial and as-applied challenges). *See infra* note 10 (quoting and discussing Chief Justice Roberts's concurrence).

It is also worth noting that the Supreme Court decided the facial challenge in *Citizens United* in a way that was consistent with this dissent's analysis of the facial/as-applied distinction, and did not employ the "no set of circumstances" test. The Court announced that it was deciding the facial constitutionality of the statute at issue, *id.* at 892-96; explained that it was applying strict scrutiny, *id.* at 898; and held that the statute was facially unconstitutional, *id.* at 913. Several more examples of Supreme Court and Fifth Circuit cases in which the courts have resolved facial challenges while disregarding the "no set of circumstances" test are collected in section II.D below.

[8] Further underscoring that facial and as-applied challenges are simply arguments for particular remedies, the *Citizens United* Court explained that Citizens United's facial challenge (which asked the Court to overrule *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)) was "not a new claim" but was only "a new argument" in support of Citizens United's "claim that the FEC ha[d] violated its First Amendment right to free speech." *Citizens United*, 130 S. Ct. at 893. Thus, the underlying *claim* was that the plaintiff's constitutional right had been violated; the facial and as-applied challenges were the plaintiff's *arguments* in support of that claim; and the difference between the facial and as-applied arguments was that they led to different remedies.

Likewise, in the instant case, Sonnier's facial and as-applied challenges are not separate *claims*, but are distinct *arguments* supporting Sonnier's claim that SLU has violated his First Amendment right to free speech. The difference between Sonnier's facial and as-applied arguments is that the as-applied arguments, if accepted, would lead to a narrower holding that the challenged policy is invalid under certain circumstances, whereas the facial arguments would lead to a broader holding that the challenged policy is invalid in *all* circumstances.

36

No. 09-30186

case, the plaintiff has made both types of arguments before this court and the district court.

In *Citizens United* as well as other cases, the Supreme Court has relied on what is perhaps the clearest explanation of the relation between facial and as-applied challenges: Richard H. Fallon, Jr., *As-Applied Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1336-39 (2000).[9]  It is worth quoting that article at length here in order to correct some common misconceptions:

> [T]he terms of discourse frequently suggest that there is a sharp, categorical distinction between facial and as-applied adjudication and that courts are often called upon to apply general principles governing facial challenges.  Both suggestions are misleading.
>
> . . .
>
> Facial challenges are not sharply categorically distinct from as-applied challenges to the validity of statutes.  Under Article III, a federal court must always begin with a case, framed by concrete facts including an allegation of harm to a specific plaintiff caused by an identified defendant.  The focus of concern must be whether the plaintiff is entitled to relief.  To adjudicate a case, however, a court will invoke legal doctrine, typically as reflected in general rules, principles, or tests.  Moreover, the application of doctrine — including the processes of reasoning necessary to resolve the dispute — will sometimes unmistakably,

---

[9] *See Citizens United*, 130 S. Ct. at 893 ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases." (quoting Fallon, *supra*, at 1339) (internal quotation marks omitted)); *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) ("[A]s-applied challenges are the basic building blocks of constitutional adjudication." (quoting Fallon, *supra*, at 1328) (internal quotation marks omitted)); *Sabri*, 541 U.S. at 610 (citing Fallon, *supra*, at 1351).

Federal appellate courts, too, have often made use of this article. *E.g.*, *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172-73 (4th Cir. 2009) (en banc) (quoting at length from Fallon, *supra*, at 1331, 1337, 1368).

even necessarily, yield the conclusion that a statute is invalid, not merely as applied to the facts, but more generally or even in whole. In such cases, facial invalidation occurs as an outgrowth of as-applied adjudication.

*Marbury v. Madison*, [5 U.S. 137 (1803),] often regarded as the foundation for the traditional model of as-applied adjudication, is exemplary. In *Marbury*, the Supreme Court considered whether a provision of the 1789 Judiciary Act permissibly vested the Court with original jurisdiction over William Marbury's suit against James Madison. In ruling that Article III forbade the exercise of jurisdiction, the Court in one sense engaged in as-applied adjudication. It decided the constitutional issue only as an incident of determining its jurisdiction in a particular case. At the same time, *Marbury*'s reasoning was general. The Court made clear that the challenged provision of the Judiciary Act was invalid not merely as applied to Marbury's suit against Madison, but in all cases insofar as it purported to confer original Supreme Court jurisdiction not contemplated by Article III.

As it was in *Marbury v. Madison*, so it is in myriad other circumstances: in ruling on an as-applied challenge, a court incidentally reaches a conclusion that a statute is more broadly invalid. In the modern day, the variety of tests employed in constitutional litigation is seemingly endless. Nonetheless, familiar and recurring kinds of tests illustrate how as-applied adjudication can inevitably result in facial invalidations. "Purpose" tests identify statutes as invalid if enacted for constitutionally forbidden motives. . . . "Suspect-content" tests, under which statutes that regulate on certain bases must be justified as narrowly tailored to advance a compelling state interest, have similar effects. A statute that fails a suspect-content test is invalid in whole.

Just as some assessments of "as-applied" challenges necessarily yield the conclusion that a statute is wholly invalid, other judicial analyses — conducted pursuant to other doctrinal tests — establish that statutes are invalid in part. In *United*

No. 09-30186

> *States v. National Treasury Employees Union*, [513 U.S. 454
> (1995),] for example, the plaintiffs challenged a federal statute
> forbidding certain governmental employees to receive honoraria
> for speaking or writing.  To assess the claim, the Court
> articulated a balancing test.  Under that test, it found the statute
> invalid as applied to the relatively low-level employees who had
> brought suit, but it noted that its reasoning would not necessarily
> apply to cases involving higher-level employees.  The Court thus
> reserved the question of the statute's validity as to categories of
> employees not before the Court.  [*See id.* at 477-78.]

> Examples could be multiplied, all to the same effect: when a
> court upholds a constitutional challenge, the nature of the test
> that it applies will determine whether the statute is found
> unconstitutional solely as applied, in part, or in whole.  Even
> facial invalidations are the outgrowth of litigation that is, in an
> important sense, as-applied.  But once a case is brought, no
> general categorical line bars a court from making broader
> pronouncements of invalidity in properly "as-applied" cases.  Nor
> is there a distinctive class of "facial challenge" cases in which the
> court is required to do so.

Fallon, *supra*, at 1336-39 (footnotes omitted).  The key point is that facial and
as-applied challenges are not categorically different types of cases to which
different rules of decision apply.  On the contrary, in order to adjudicate
constitutional challenges, courts apply whatever constitutional doctrines and
tests are relevant to the substance of each particular case, and the results of
that analysis determine whether a challenged law is unconstitutional, either
on its face or as applied to a particular situation.[10]

_____

[10] This understanding is further reinforced by Chief Justice Roberts's concurrence in
*Citizens United*:

> [T]he debate over whether to consider this claim on an as-applied or facial basis
> strikes me as largely beside the point.  Citizens United . . . has a constitutional
> claim — the Act violates the First Amendment, because it prohibits political
> speech.  The Government has a defense — the Act may be enforced, consistent

No. 09-30186

As the Supreme Court said in *Citizens United*, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." 130 S. Ct. at 893. There is "no general categorical line" between facial and as-applied challenges. *Id.* (quoting Fallon, *supra*, at 1339). The facial/as-applied distinction merely "goes to the breadth of the remedy employed," *id.*, because a facial challenge is an argument for the facial invalidation of a law, whereas an as-applied challenge is an argument for the narrower remedy of as-applied invalidation.[11]  Therefore, the

> with the First Amendment, against corporations.  Whether the claim or the defense prevails is the question before us.
>
> Given the nature of that claim and defense, it makes no difference of any substance whether this case is resolved by invalidating the statute on its face or only as applied to Citizens United.  Even if considered in as-applied terms, a holding in this case that the Act may not be applied to Citizens United — because corporations as well as individuals enjoy the pertinent First Amendment rights — would mean that any other corporation raising the same challenge would also win.  Likewise, a conclusion that the Act may be applied to Citizens United — because it is constitutional to prohibit corporate political speech — would similarly govern future cases.  Regardless whether we label Citizens United's claim a "facial" or "as-applied" challenge, the consequences of the Court's decision are the same.

130 S. Ct. at 919 (Roberts, C.J., concurring).  As the Chief Justice recognized, the labels of "facial" and "as-applied" were "beside the point"; the real question was whether the challenged law was consistent with the First Amendment, and the Court's answer to that substantive constitutional question would determine whether the statute was unconstitutional on its face, unconstitutional as applied, or constitutional.

Likewise, in every case in which a law is subjected to a constitutional challenge — including the instant case — the proper method is to apply the relevant substantive constitutional doctrines and tests, and the result of that process determines whether the challenged law should be held unconstitutional either on its face or as applied.

[11] It is worth briefly noting that this understanding of the distinction between facial and as-applied challenges is not necessarily inconsistent with the opinion that has been read as creating the "no set of circumstances" test, *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Federal Circuit, in *Rothe Development Corp. v. Department of Defense*, 413 F.3d 1327 (Fed. Cir. 2005), adjudicated a facial challenge to a statute under strict scrutiny and not the "no set of circumstances" test.  *Id.* at 1329, 1337-38.  The court explained, "*Salerno* is of

40

No. 09-30186

underlying question in this case — that is, whether the SLU speech policy is consistent with the First Amendment — must be determined, not by applying a special test for all facial challenges (the majority's "no set of circumstances" test), but by applying the substantive constitutional test that determines the constitutionality of the type of regulation that is challenged here.  That test is intermediate scrutiny as defined in cases like *Ward* and *Knowles*, which requires that a content-neutral restriction on the time, place, or manner of speech must be narrowly tailored to serve a significant government interest.

## C.  The "no set of circumstances" test is inconsistent with the requirements of intermediate scrutiny, and is therefore inapplicable to this case.

---

limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test."  *Id.* at 1337-38.  Thus, the *Rothe* court read *Salerno* as being consistent with the principle that the facial/as-applied distinction "goes to the breadth of the remedy employed by the Court," *Citizens United*, 130 S. Ct. at 893.  Under this reading, *Salerno* simply means that a successful facial challenge has the *outcome* of "establish[ing] that no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at 745.  *See also Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 797-98 (1984) ("In cases of this character a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner.").

Under the Federal Circuit's reading, the *Salerno* "no set of circumstances" language does not create a universal *test* for all facial challenges; instead, it only describes the *outcome* of a successful facial challenge.  This reading is consistent with all the authorities cited in this dissent that are in conflict with the "no set of circumstances" test.  A few other courts and at least one eminent law professor have adopted this reading of *Salerno*.  *Daskalea v. Wash. Humane Society*, 480 F. Supp. 2d 16, 36 n.22 (D.D.C. 2007); *MDK, Inc. v. Vill. of Grafton*, 345 F. Supp. 2d 952, 960 (E.D. Wis. 2004); *In re Termination of Parental Rights to Diana P.*, 694 N.W.2d 344, 361 (Wis. 2005) (Roggensack, J., concurring); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1342-43 (2000).  The article that makes the most thorough case for this reading is Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am. U. L. Rev. 359 (1998), on which the *Rothe* court relied.

41

No. 09-30186

The majority's "no set of circumstances" test is vastly different from, and logically incompatible with, the intermediate scrutiny test. These two tests allocate the burden of persuasion differently; they provide different criteria to determine a law's constitutional validity; and they are likely to produce opposite results in a great many cases, including this one. Thus, the majority's reliance on the "no set of circumstances" test in this case contravenes the numerous precedents which establish that intermediate scrutiny is the proper way to determine the constitutionality of a content-neutral restriction on the time, place, or manner of speech. The only way to remain consistent with the precedents on intermediate scrutiny is to reject the erroneous "no set of circumstances" test.

> The well-known requirements of intermediate scrutiny are as follows:

> the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984))).[12] "A regulation 'is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy.'" *Id.* at 434 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). In other words, "[a] regulation is 'narrowly tailored' when it does not 'burden substantially more speech than is necessary to further the

---

[12] Even the defendants' brief on appeal agrees that this is the applicable standard.

No. 09-30186

government's legitimate interests.'" *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992) (quoting *Ward*, 491 U.S. at 799). "At a minimum, a regulation cannot be narrowly tailored unless the cost to speech is 'carefully calculated' and the fit between the burden and the state interest is 'reasonable.'" *Id.* (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989)).

"The government bears the burden of establishing that the regulations are reasonable." *Id.* That is, the government must identify the significant state interests to which a challenged regulation is narrowly tailored, and "show affirmatively that the[] restriction is narrowly tailored to protect the identified interests." *Id.* at 119. In summary, a content-neutral restriction on the time, place, or manner of speech must be narrowly tailored to serve a significant governmental interest, and the government bears the burden of identifying such interests and showing how the restriction is narrowly tailored to them.

As explained above, although the majority opinion initially seems to acknowledge that intermediate scrutiny is the governing test, the majority ends up relying on the "no set of circumstances" test instead. The two tests are inconsistent with one another for multiple reasons. First of all, they allocate the burden of persuasion in opposite directions. Intermediate scrutiny requires *the government* to justify the restrictions that it imposes on public speech. *Hays County Guardian*, 969 F.2d at 118. But the "no set of circumstances" test, as explained by the majority opinion, requires that "*the challenger* must establish that no set of circumstances exists under which the Act would be valid." Maj. Op. 11 (emphasis added) (quoting *United States v.*

43

No. 09-30186

*Salerno*, 481 U.S. 739, 745 (1987)).  The majority opinion, in applying the "no set of circumstances" test, reiterates that it puts the burden on the plaintiff: "*the plaintiff must establish* the regulation would be invalid in all circumstances."  Maj. Op. 15 (emphasis added).  "*Sonnier has not demonstrated* that the SLU regulation is invalid in all circumstances."  Maj. Op. 16 (emphasis added).  "*Sonnier has not demonstrated* that in every instance this regulation is invalid."  Maj. Op. 18 (emphasis added).  And this difference in the allocation of the burden of persuasion is not a mere technicality.  By putting the burden on Sonnier, the majority demands that he prove a negative.  This is improper not only because it is practically impossible to meet such a demand, but also because "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000).  *See also Hays County Guardian*, 969 F.2d at 119.  Intermediate scrutiny appropriately puts the burden of persuasion on the government; the "no set of circumstances" test fails to do so.  The two tests are therefore inconsistent with one another.

Second, intermediate scrutiny and the "no set of circumstances" test require courts to base their decisions on entirely different criteria.  Intermediate scrutiny requires courts to begin by identifying the legitimate government interests, if any, that are served by a restriction on speech.  Courts must then decide whether the restriction is narrowly tailored to those identified interests — in other words, whether the restriction "does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  *Hays County Guardian*, 969 F.2d at 118

44

No. 09-30186

(quoting *Ward*, 491 U.S. at 799).  Thus, intermediate scrutiny requires a court to look at the overall burden on speech that is imposed by a challenged restriction, and decide whether that burden is substantially greater than necessary.  By contrast, the "no set of circumstances" test does not require this sort of consideration of the "fit between the burden and the state interest," *id.* — instead, it only requires the court to exercise its imagination in order to come up with some possible scenario in which the restriction at issue would survive an as-applied challenge.  That is the process the majority has followed in applying the "no set of circumstances" test here.[13]  Because intermediate scrutiny and the "no set of circumstances" test require courts to use completely different decisionmaking processes, the two tests are incompatible.

Third, considering the vast differences between them, it follows that these two tests are likely to produce opposite results in a wide variety of cases.  This case exemplifies the difference in results.  The majority, applying the "no set of circumstances" test, holds that the challenged provisions of the SLU speech policy are facially constitutional.  I, on the other hand, would apply intermediate scrutiny under *Ward* and *Knowles* and therefore conclude that the imposition of a permit requirement on individuals and small groups, the seven-day advance notice requirement, the limitation of speech to two hours per seven days, and the broad personal information collection

---

[13] *E.g.*, Maj. Op. 15 ("If Sonnier expected to attract a large number of students with his message . . . If Sonnier desired to speak on SLU's campus at the same time as a number of other individuals and organizations . . . If Sonnier or another speaker wished to speak at a time when multiple members of the SLU administration were scheduled to be out of the office . . . .").

45

No. 09-30186

requirement are unconstitutional.  The reasons why these provisions do not survive intermediate scrutiny are explained below in Part III.

For all these reasons, the majority's application of the "no set of circumstances" test contravenes the long list of Supreme Court and Fifth Circuit precedents which establish that intermediate scrutiny is the proper way to determine whether a content-neutral restriction on the time, place, or manner of speech is constitutional.[14]  It is not possible to apply both the "no set of circumstances" test and the intermediate scrutiny test and reach consistent results.  We should therefore apply intermediate scrutiny, a test that has been firmly established by a long line of governing precedents.

### D.  The Supreme Court and the Fifth Circuit have repeatedly disregarded or rejected the "no set of circumstances" test in cases where it was incompatible with the relevant constitutional doctrines.

---

[14] *E.g.*, *Hill v. Colorado*, 530 U.S. 703, 725-26 (2000); *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Frisby v. Schultz*, 487 U.S. 474, 481-82, 485 (1988); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804-05 (1984); *United States v. Grace*, 461 U.S. 171, 177 (1983); *Serv. Employees Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010); *Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006); *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992); *Beckerman v. City of Tupelo*, 664 F.2d 502, 516 (5th Cir. 1981).

No. 09-30186

Controversy among Supreme Court Justices[15] and doubt among the lower courts[16] regarding the "no set of circumstances" language has persisted since that phrase first appeared in *United States v. Salerno*, 481 U.S. 739, 745 (1987). In some recent cases, the Court has openly recognized, but not resolved, the dispute as to whether the "no set of circumstances" language is the governing test for all,[17] or any, facial challenges. *See United States v.*

---

[15] *See City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself . . . ."); *id.* at 78-81 (Scalia, J., dissenting) (defending the "no set of circumstances" test); *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175-76 (1996) (mem.) (opinion of Stevens, J., respecting denial of certiorari) (characterizing the "no set of circumstances" test as a dictum, "unsupported by citation or precedent," inconsistent with an array of legal principles, and "draconian" in its effects); *id.* at 1178-81 (Scalia, J., dissenting from denial of certiorari) (characterizing the "no set of circumstances" test as "a long established principle of our jurisprudence" but citing no Supreme Court case decided prior to *Salerno* to support it).

[16] For example, the Eleventh Circuit in *United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000), noted that the "no set of circumstances" test "has been subject to a heated debate in the Supreme Court, where it has not been consistently followed." *Id.* at 1235 n.3. The court decided not to apply the "no set of circumstances" test to the facial challenge in that case because "[w]hatever the precise scope of the general rule may be, the Supreme Court and this Court consistently have permitted facial challenges to prior restraints on speech without requiring the plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *Id.* at 1236.

The Sixth Circuit, in *Staley v. Jones*, 239 F.3d 769 (6th Cir. 2001), considered *Morales* to have overruled *Salerno* at least as to facial challenges under the vagueness doctrine, and held that prior to *Morales* there was no clearly established federal law on that issue. *Id.* at 789-90. And the en banc Fourth Circuit in *Richmond Medical Center for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009) (en banc), after considering *Salerno* and other cases, concluded that "[w]e need not . . . attempt to resolve the uncertainty regarding the appropriate criteria for entertaining facial challenges" because the facial challenge in that case failed even if "no set of circumstances" was not the proper test. *Id.* at 174.

[17] The "no set of circumstances" passage in *Salerno* excludes the narrow category of facial challenges under the overbreadth doctrine in the context of the First Amendment. 481 U.S. at 745. That exception is not at issue here. The majority in this case considers the "no

No. 09-30186

*Stevens*, 130 S. Ct. 1577,1587 (2010)[18]; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007).  The Court has sometimes quoted the "no set of circumstances" language in a positive light (without actually using it as the basis for a decision),[19] but the phrase appears more frequently in Supreme Court dissents which have accurately pointed out that the majorities in those cases were not following the "no set of circumstances" test.[20]  Importantly, after diligent research I have been unable to find a single Supreme Court case

---

set of circumstances" test to apply to all other facial challenges.  Maj. Op. 11 & n.6.

[18] The Court in *Stevens* wrote:
> To succeed in a typical facial attack, Stevens would have to establish "that no set of circumstances exists under which [§ 48] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 . . . (1987), or that the statute lacks any "plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 . . . (1997) (STEVENS, J., concurring in judgments) (internal quotation marks omitted). Which standard applies in a typical case is a matter of dispute that we need not and do not address, and neither *Salerno* nor *Glucksberg* is a speech case.

130 S. Ct. at 1587.  The Court's mention of speech cases is noteworthy here, since it suggests that some Justices may consider the "no set of circumstances" test to be inapplicable to speech cases even if it does apply to facial challenges in some other area of law.  However, as will be discussed below, there are also Supreme Court decisions in several other areas of constitutional law that conflict with the "no set of circumstances" test.

[19] *See Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995); *Reno v. Flores*, 507 U.S. 292, 301 (1993); *Rust v. Sullivan*, 500 U.S. 173, 183 (1991); *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514 (1990).

[20] *See Virginia v. Black*, 538 U.S. 343, 375 n.4 (2003) (Scalia, J., concurring in part and dissenting in part); *Stenberg v. Carhart*, 530 U.S. 914, 1019 (2000) (Thomas, J., dissenting); *Morales*, 527 U.S. at 78-81 (Scalia, J., dissenting); *Romer v. Evans*, 517 U.S. 620, 643 (1996) (Scalia, J., dissenting); *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011 (1992) (Scalia, J., dissenting from denial of certiorari); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 973 (1992) (Rehnquist, C.J., concurring in the judgment in part and dissenting in part); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 82-83 (1992) (Rehnquist, C.J., dissenting); *Bowen v. Kendrick*, 487 U.S. 589, 627 n.1 (1988) (Blackmun, J., dissenting).

No. 09-30186

— including *Salerno* itself — in which the holding actually relied on the "no set of circumstances" test.[21]  That language therefore remains nothing more than a controversial dictum.

Although lower courts should ordinarily take a deferential position toward Supreme Court dicta,[22] this particular dictum is contradicted by the reasoning and the results of several subsequent Supreme Court cases.  In addition, our own court has already issued at least four post-*Salerno* decisions which have directly contradicted the "no set of circumstances" test.

The list of Supreme Court cases contradicting the "no set of circumstances" test includes (but is not limited to) *Hill v. Colorado*, 530 U.S. 703 (2000); *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000); *City of Chicago v. Morales*, 527 U.S. 41 (1999); *Planned Parenthood of*

---

[21] In *Morales*, the plurality opinion stated that "the *Salerno* formulation . . . has never been the decisive factor in any decision of this Court, including *Salerno* itself."  527 U.S. 41, 55 n.22 (plurality opinion).  Justice Scalia's dissent argued in favor of the "no set of circumstances" test, but tacitly conceded the inability to cite any case in which it had been "the decisive factor."  *See id.* at 80 n.3 (Scalia, J., dissenting).  While *Morales* was decided in 1999, my research has not revealed any Supreme Court case before or since then in which the "no set of circumstances" test has been decisive.  *See supra* notes 19-20 (collecting cases in which that test has been mentioned).

[22] "Of course, we treat the considered dicta of the Supreme Court with greater weight and deference 'as prophecy of what that Court might hold.'"  *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1131 (9th Cir. 2010) (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc)).  "We do not blindly, however, follow an unconsidered statement simply because it was uttered by the Supreme Court."  *Id.*
  "While the dicta of the Supreme Court merits our deference, we also heed Chief Justice Marshall's admonition that:
>     general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision . . . ."
*In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 92-93 (2d Cir. 1993) (quoting *Cohens v. Virginia*, 19 U.S. 264, 399 (1821)).

49

*Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992); *Bowen v. Kendrick*, 487 U.S. 589 (1988); and *Frisby v. Schultz*, 487 U.S 474 (1988).  The Fifth Circuit cases include *Service Employees International Union, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010); *Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006); *Doe v. Santa Fe Independent School District*, 168 F.3d 806 (5th Cir. 1999); and *Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996).  In each of these cases (which will be discussed more specifically below), the courts adjudicated facial challenges by relying on substantive constitutional doctrines that were incompatible with the "no set of circumstances" test.  Some of these cases involved intermediate scrutiny, while others involved other constitutional tests — but they were all facial challenges, and in all of them the courts disregarded or rejected the "no set of circumstances" test.  These cases, all of which are binding on us, strongly support the conclusion that the "no set of circumstances" test simply is not an accurate statement of the law that governs this case.

The "no set of circumstances" test arose from this sentence in *Salerno*: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  481 U.S. at 745.  This language constitutes dicta, not a holding, because it was not part of the basis for the Supreme Court's decision in *Salerno*.  The respondents in *Salerno* brought a facial challenge to the Bail Reform Act, but they did not claim that the Act was unconstitutional as applied to them.  *Id.* at 745 n.3.  Therefore, if *Salerno* had really held that identifying a single valid application of a law is enough to defeat a facial challenge, the Court could

No. 09-30186

have rejected the facial challenge simply because the Act was not unconstitutional as it had been applied to the respondents in that case. *See Morales*, 527 U.S. at 55 n.22 (plurality opinion) (explaining that the sentence was dicta for this reason).[23]  But instead, the Supreme Court decided in *Salerno* that the Bail Reform Act was facially constitutional, not because it satisfied the "no set of circumstances" test, but because the Act as written was consistent with the Court's interpretation of the Due Process Clause and the Eighth Amendment.[24]

---

[23] *See also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (opinion of Stevens, J., respecting denial of certiorari) (observing that the controversial statement was "unnecessary to the holding in [*Salerno*], for the Court effectively held that the statute at issue would be constitutional as applied in a large fraction of cases").

[24] The specific reasoning by which the Supreme Court resolved the facial challenge in *Salerno* was as follows.  As to the Due Process Clause, the Court acknowledged that there is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial," 481 U.S. at 749, but nonetheless held that "this right may . . . be subordinated to the greater needs of society" and that "Congress' careful delineation of the circumstances under which detention will be permitted satisfies this standard," *id.* at 750-51.  The Court thus balanced the rights of arrestees against the interests of society and decided that the Bail Reform Act, on its face, was constitutional because it did not go too far in "subordinat[ing]" the rights of arrestees.

As to the Eighth Amendment, the Court held that "when Congress has mandated [pretrial] detention on the basis of a compelling interest other than prevention of flight [such as public safety], as it has here, the Eighth Amendment does not require release on bail." *Id.* at 754-55.  Thus, the Court's reasoning centered on what the Eighth Amendment does and does not require the government to do.  It held that the Bail Reform Act was facially constitutional because the Eighth Amendment does not forbid Congress from mandating pretrial detention for arrestees who are thought to pose a danger to the community.

Therefore, the Supreme Court's decision in *Salerno* was not at all based on the "no set of circumstances" dictum.  "In each step of its analysis, the Court measured the Bail Reform Act against the substantive requirements of the Due Process Clause and the Eighth Amendment as articulated in the relevant doctrinal tests.  The *Salerno* defendants lost their facial challenge, not because the Court was able to identify some constitutional applications, but because the Court held that the Act on its face satisfied all of the applicable due process and Eighth Amendment doctrinal tests."  Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am. U. L. Rev. 359, 399 (1998).

No. 09-30186

Furthermore, *Salerno*'s "no set of circumstances" language has never played a decisive role in any subsequent Supreme Court case either, as far as my research has shown. *See Morales*, 527 U.S. at 55 n.22 (plurality opinion) (asserting that "the *Salerno* formulation . . . has never been the decisive factor in any decision of this Court, including *Salerno* itself"); *id.* at 80 n.3 (Scalia, J., dissenting) (responding to Justice Stevens's claim, but not citing any Supreme Court case in which the "no set of circumstances" language has been decisive). Thus, although some Justices have debated whether the "no set of circumstances" test *should* be the law, the Supreme Court has never actually *held* that that language governs all (or any) facial challenges. *See also United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (acknowledging that this issue "is a matter of dispute that we . . . do not address").

In sharp contrast to the absence of any Supreme Court cases in which the "no set of circumstances" test has actually been adopted as the law, there have been a significant number of post-*Salerno* cases in which the Court has adjudicated facial challenges in a manner that was inconsistent with that supposedly governing test. Our court, too, has done likewise on several occasions.

For instance, the Supreme Court and this court have repeatedly disregarded the "no set of circumstances" test in deciding facial challenges in Establishment Clause cases, because it is inconsistent with the substantive constitutional tests that apply in that area of constitutional law. Only a year after *Salerno* was decided, the Supreme Court in *Bowen v. Kendrick*, 487 U.S.

No. 09-30186

589 (1988), applied the *Lemon* test[25] to decide a facial challenge to a statute, and ignored the government's argument that the Court should instead apply *Salerno* to resolve the facial challenge. The four dissenting Justices expressly agreed with this aspect of the majority's reasoning because the "no set of circumstances" test "is wholly incongruous with the analysis of an Establishment Clause challenge under *Lemon*." *Id.* at 627 n.1 (Blackmun, J., dissenting).

Following *Bowen*'s lead, the Fifth Circuit in *Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996), sustained a facial challenge to a school prayer law under the Establishment Clause, holding that the law failed the *Lemon* test, the "coercion test," and the "endorsement test." *Id.* at 278-80. Some circuit judges accurately pointed out that the *Ingebretsen* panel's reasoning and holding were contrary to the "no set of circumstances" test: "It would be ludicrous to assert, and the panel did not attempt to do so, that there is 'no set of circumstances' under which the Mississippi prayer statute can be upheld." *Id.* at 286 (Jones, J., dissenting from denial of rehearing en banc) (quoting *Salerno*, 481 U.S. at 745). The Supreme Court denied certiorari. 519 U.S. 965 (mem.).

Three years later, the Fifth Circuit again disregarded the "no set of circumstances" test and sustained a facial challenge to a school district's policy regarding prayer in *Doe v. Santa Fe Independent School District*, 168 F.3d 806 (5th Cir. 1999). This time, the Supreme Court granted certiorari and affirmed our court's holding that the school policy at issue was facially

---

[25] The *Lemon* test, which takes its name from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), is a three-part test for deciding whether a law violates the Establishment Clause. *See Bowen*, 487 U.S. at 602.

unconstitutional.  530 U.S. 290, 316 (2000).  (The policy "impose[d] on the student body a majoritarian election on the issue of prayer" before football games.  *Id.*)  The dissents in both the Supreme Court and the Fifth Circuit criticized the majorities for not following the "no set of circumstances" test.  530 U.S. at 318 (Rehnquist, C.J., dissenting); 168 F.3d at 832 (Jolly, J., dissenting).  Chief Justice Rehnquist's dissent showed that it was possible to imagine circumstances in which the school policy could survive an as-applied challenge.  For instance, "it is possible that the students might vote not to have a pregame speaker, in which case there would be no threat of a constitutional violation."  530 U.S. at 321.  Nonetheless, the six-Justice Supreme Court majority declined to apply the "no set of circumstances" test and held that the policy was facially unconstitutional.  *Id.* at 316 (majority opinion).

The reason that both the Supreme Court and this court rejected the "no set of circumstances" test in *Santa Fe*, *Bowen*, and *Ingebretsen* is readily apparent: the use of that test would have been incongruous with the constitutional tests that courts normally use to decide whether a law violates the Establishment Clause, including the *Lemon* test, the coercion test, and the endorsement test, *see Ingebretsen*, 88 F.3d at 279.  Those cases presented essentially the same situation as the instant case: the "no set of circumstances" test is incompatible with the test that actually applies here — intermediate scrutiny — so the correct way to decide this case is to apply intermediate scrutiny.

Those Establishment Clause cases are not the only ones in which the Supreme Court has reached decisions that were incompatible with the "no set

of circumstances" dictum.  Another such case was *Morales*, in which the Court sustained a facial challenge to a Chicago anti-loitering ordinance because it was unconstitutionally vague and gave too much discretion to the police.  *See* 527 U.S. at 51, 60-64 (majority opinion).  Justice Scalia, in dissent, explained that the majority's reasoning and result were inconsistent with the "no set of circumstances" test because it was possible to imagine a situation in which the ordinance would have survived an as-applied challenge.  *See id.* at 81-82 (Scalia, J., dissenting) (depicting a scenario out of *West Side Story* which, under the "no set of circumstances" test, would be enough to "settle the matter of respondents' facial challenge to the ordinance's vagueness").  In *Morales*, just as in the aforementioned Establishment Clause cases, the application of the "no set of circumstances" test would have been inconsistent with the relevant substantive constitutional doctrine on which the majority relied — namely, "the requirement that a legislature establish minimal guidelines to govern law enforcement," *id.* at 60 (majority opinion) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)) (internal quotation marks omitted).  Justice Scalia's "no set of circumstances" reasoning simply did not answer the dispositive question: whether the ordinance was so vague that it failed to give minimal guidelines to govern law enforcement personnel.  The majority therefore properly decided the case on the basis of vagueness and did not apply the "no set of circumstances" dictum, which would have been incompatible with that approach.

Another example of a case in which the Supreme Court's reasoning and result were contrary to the "no set of circumstances" dictum is *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), in

No. 09-30186

which the Court held that a spousal notification requirement in a state law regulating abortion was "an undue burden, and therefore invalid." *Id.* at 895. In dissent, Chief Justice Rehnquist accurately observed that the lead opinion "appears to ignore" *Salerno*. *Id.* at 973 n.2 (Rehnquist, C.J., dissenting). He explained that under the "no set of circumstances" test, the spousal notification provision could not possibly be facially unconstitutional because "the vast majority of wives seeking abortions notify and consult with their husbands, and thus suffer no burden as a result of the provision." *Id.* There were any number of circumstances in which the notification provision would have been valid as applied, but the Supreme Court nevertheless held that it was facially unconstitutional. Many federal courts have recognized that the "undue burden" test under *Casey* contradicts the "no set of circumstances" test. *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 368-69 (6th Cir. 2006) (reviewing cases from nine other circuits). In short, the Supreme Court in *Casey* did the same thing it did in *Morales*, *Santa Fe*, and *Bowen*: it did not follow *Salerno*'s "no set of circumstances" dictum, and instead applied the relevant substantive constitutional test — which, the plurality in *Casey* decided, was the "undue burden" test.

The Supreme Court and our court have also disregarded the "no set of circumstances" test when adjudicating facial challenges raising the very same constitutional question that arises in this case: whether a content-neutral restriction on the time, place, or manner of speech is narrowly tailored to serve a significant governmental interest. The year after *Salerno* was decided, the Court applied intermediate scrutiny and not the "no set of circumstances" test in *Frisby v. Schultz*, 487 U.S 474 (1988). The majority

56

No. 09-30186

held that the law at issue (an ordinance forbidding picketing in front of residences) was narrowly tailored and was therefore facially constitutional. *Id.* at 488. The Court supported its holding not by imagining a single constitutionally valid application of the ordinance (which would be sufficient to defeat a facial challenge under the "no set of circumstances" test), but by considering the entire scope of the ordinance's restriction on speech and determining that it was narrowly tailored. *See id.* at 485-88.

Likewise, in *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court rejected a facial challenge to a content-neutral restriction on the time, place, and manner of speech (a state law restricting protests near health care facilities). *See id.* at 708 (noting that this was a facial challenge). The majority and the dissenters disagreed over whether the restriction was narrowly tailored, but none of the Justices even raised the "no set of circumstances" test. The majority held that the law was facially constitutional because it was narrowly tailored, and did not employ the "no set of circumstances" test. *See id.* at 725-30 (majority opinion). Justice Scalia, in dissent, argued that the law was not narrowly tailored, and hence was facially unconstitutional, because "with respect to those who are seeking to enter or exit [health care] facilities, the statute does not protect them only from speech that is so intimidating or threatening as to impede access. Rather, it covers *all* unconsented-to approaches for the purpose of oral protest, education, or counseling . . . ." *Id.* at 755 (Scalia, J., dissenting). Thus, Justice Scalia believed that the law could have legitimately been applied to speech that was "so intimidating or threatening as to impede access" to health care facilities. Under the "no set of circumstances" test, this

57

single imagined circumstance under which the law would have been valid as applied would have been enough to uphold the facial constitutionality of the challenged law. Yet Justice Scalia argued that it was facially unconstitutional. Thus, in *Hill*, all nine Justices completely ignored the "no set of circumstances" test, even though that test would have easily compelled the conclusion that the challenged law was facially constitutional.

Furthermore, the Fifth Circuit has twice sustained facial challenges to content-neutral time-place-manner restrictions, even though those restrictions would plainly have been facially constitutional under the "no set of circumstances" test. In *Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006), this court held that two municipal ordinances were facially unconstitutional because they were not narrowly tailored to serve a significant governmental interest. The ordinances forbade all "parades" and "street activity" at particular times of day, and imposed a permit requirement at all times. 462 F.3d at 431-32. The ordinances would have been facially constitutional under the "no set of circumstances" test because it would have been trivially easy for the court to imagine particular kinds of "parades" and "street activities" on which the ordinances' time restrictions and permit requirement could validly be imposed. For example, a sizable parade with floats and marching bands could have been subjected to a permit requirement, and could have been prohibited from passing through a school zone around the end of the school day. But this court properly disregarded the "no set of circumstances" test and instead applied intermediate scrutiny, holding that the ordinances were not narrowly tailored and were therefore

facially unconstitutional. *Id*. at 431, 433 (facial challenge); *id*. at 437 (holding both ordinances unconstitutional).

Just recently, in *Service Employees International Union, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010), this court again sustained a facial challenge to a content-neutral time-place-manner restriction even though the "no set of circumstances" test would have required the opposite result. The court held that an ordinance "confin[ing] downtown weekday parades to two one-hour windows: 10:00 a.m. to 11:00 a.m. and 2:00 p.m. to 3:00 p.m.," *id*. at 603, was facially unconstitutional. *Id*. at 604; *see also id*. at 595 (noting that the plaintiffs had brought a facial challenge). If the court had applied the "no set of circumstances" test, it would have had to hold that the ordinance was facially constitutional because it is possible to imagine a single day on which it might have been valid for the city to confine downtown parades to those two one-hour windows — for instance, a weekday when some kind of festival was scheduled to take place downtown between 11:00 a.m. and 2:00 p.m. But the *SEIU v. Houston* court did not follow this kind of reasoning; rather, it explained that the restriction was not narrowly tailored: "there is scant connection between the restrictive parade hours and the putative consequences that are the justifications for the Ordinance." *Id*. at 604. Thus, *SEIU v. Houston* and *Knowles* show that this circuit, like the Supreme Court, has quite properly disregarded the supposed "no set of circumstances" test when adjudicating facial challenges under intermediate scrutiny.

The collection of Supreme Court and Fifth Circuit cases discussed here — *Bowen*, *Ingebretsen*, *Santa Fe*, *Morales*, *Casey*, *Frisby*, *Hill*, *Knowles*, and *SEIU v. Houston* — demonstrates whatever authority the *Salerno* "no set of

No. 09-30186

circumstances" dictum may have once had has not endured.  The majority opinion's reliance on that dictum to decide this case is out of step with a large and growing body of authoritative caselaw to the contrary.

*     *     *

To summarize the foregoing analysis, there are at least three different lines of authority supporting the conclusion that the *Salerno* "no set of circumstances" dictum does not provide an appropriate standard for adjudicating this facial challenge.  First, the "no set of circumstances" test supposedly governs all facial challenges, but the Supreme Court in *Citizens United v. FEC* has contradicted the erroneous idea that there is one single test for all facial challenges; on the contrary, the facial/as-applied distinction does not have any "automatic effect" on the disposition of a case.  130 S. Ct. 876, 893 (2010).  Second, the "no set of circumstances" test is incompatible with intermediate scrutiny because the two tests allocate the burden in opposite ways, require the courts to focus on very different criteria, and ultimately produce incompatible results; thus, by applying the "no set of circumstances" test, the majority contravenes the numerous precedents (such as *Ward* and *Knowles*) holding that intermediate scrutiny is the appropriate constitutional test for the content-neutral time-place-manner restriction that is at issue here.  Third, the Supreme Court and this court have repeatedly decided cases using reasoning and reaching results contrary to those required by the "no set of circumstances" test, e.g., *Santa Fe*, *Morales*, *Casey*, and *Knowles*.  Therefore, considering all of the above, I believe the majority in this case has erred by using the "no set of circumstances" test as the decisive element in its reasoning.

No. 09-30186

## III.  Application of Intermediate Scrutiny

In this case, the plaintiff has brought a constitutional challenge to certain provisions of SLU's policy on speech and assembly.  These provisions are content-neutral[26] and regulate the time, place, and manner of speech.  Therefore, the test that determines their constitutional validity is the intermediate scrutiny standard as defined in numerous cases such as *Ward* and *Knowles*.  To pass this test, a law must be narrowly tailored to serve a significant government interest.  The remainder of this dissent examines whether the challenged speech restrictions — which require individuals and small groups to apply seven days in advance for permission to speak in public; require the disclosure of significant personal information from everyone who plays any role in a speech event; and limit the speech of any individual or group to two hours per seven days — are narrowly tailored to the significant interests that the government has identified.

### A.  *Our Time-Place-Manner Precedents*

Our cases uniformly hold that the government must justify content-neutral restrictions on the time, place, and manner of speech in a public forum[27] by showing that they are narrowly tailored to serve a significant

---

[26] The plaintiff's appellate brief argues that the security fee provision is not content-neutral.  I do not address that issue here, because I agree with the majority's holding that the security fee provision is unconstitutional.  The plaintiff acknowledges that the other provisions he challenges are content-neutral.

[27] As the majority opinion says, Maj. Op. 7, and as the defendants acknowledge, the public, outdoor areas of the SLU campus are either a traditional public forum or a designated public forum.  There is no need to decide which of these two types of public forum is at issue because "[t]he state's power 'to restrict speakers' access to [a designated] public forum is subject to the same first amendment constraints that apply to traditional public forums.'"

governmental interest.  This is commonly referred to as intermediate scrutiny.  *See Serv. Employees Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010); *Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006); *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 516 (5th Cir. 1981).  "A regulation 'is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy.'" *Knowles*, 462 F.3d at 434 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).  In other words, "[a] regulation is 'narrowly tailored' when it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  "At a minimum, a regulation cannot be narrowly tailored unless the cost to speech is 'carefully calculated' and the fit between the burden and the state interest is 'reasonable.'" *Id.* (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989)).

"The government bears the burden of establishing that the regulations are reasonable." *Id.*  That is, the government must identify the significant state interests to which a challenged regulation is narrowly tailored, and "show affirmatively that the[] restriction is narrowly tailored to protect the identified interests." *Id.* at 119.

This court's method of analysis in *Knowles* exemplifies the usual and proper way of applying intermediate scrutiny to a restriction on speech. *Knowles* is on all fours with the instant case in every relevant respect: it

---

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 345 (5th Cir. 2001) ((quoting *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)).

No. 09-30186

involved a challenge to content-neutral restrictions on speech and assembly in a public forum. Moreover, the plaintiffs in *Knowles* brought purely facial challenges, and the court did not reach the issue of overbreadth. 462 F.3d at 433. Thus, even assuming that the majority is correct in addressing only Sonnier's facial challenge, *Knowles* is indistinguishable from the present case.

In *Knowles*, the plaintiffs were anti-abortion protesters who sought to "pray, display anti-abortion signs, distribute literature, and counsel clinic clients on the public sidewalk outside an abortion clinic"; they brought suit "challenging the facial constitutionality of two city ordinances that threaten[ed] their ability" to do so. *Id.* at 431. This court began its analysis by identifying the significant state interests that had been asserted by the government: "Waco's asserted interests in protecting school children and citizens on public roads are generically significant." *Id.* at 434. The court then decided whether the two challenged ordinances were narrowly tailored to the government's asserted purposes. The court concluded that "the School Zone ordinance is not narrowly tailored because the ordinance 'sweeps far more broadly than is necessary to further the city's legitimate concern' of enhancing the safety and welfare of schoolchildren and others using Waco's public rights of way." *Id.* at 435 (quoting *Ward*, 491 U.S. at 801)). It further concluded that the other ordinance, the "Parade Ordinance," was unconstitutional because "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Id.* at 436. *Knowles* thus followed five other circuits[28]

--------

[28] *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009) (en banc); *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th

No. 09-30186

in holding that laws requiring people to obtain permits for public speech and assembly must contain exceptions for small groups and individuals. The court held that the government had failed to carry its burden to show that its restrictions on speech were narrowly tailored.[29]

---

Cir. 1996); *Grossman v. City of Portland*, 33 F.3d 1200, 1206-07 (9th Cir. 1994); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).

[29] The same method of analysis under intermediate scrutiny — examining whether the government has shown a sufficiently close connection between its means and its ends — has been followed in many other cases. *See, e.g.*, *SEIU v. Houston*, 595 F.3d at 604 ("Houston has barred downtown parades for all but two one-hour periods a day on weekdays. Its asserted justification of preventing traffic congestion is arguably confined to the morning and evening rush hours. . . . [T]here is scant connection between the restrictive parade hours and the putative consequences that are the justifications for the Ordinance."); *Hays County Guardian*, 969 F.2d at 123 ("We find the University's educational goals sufficiently weighty . . . . We also find that the University's financial support for the student-run newspaper is a narrowly tailored means of advancing these interests."); *Beckerman*, 664 F.2d at 516 ("This ordinance reaches more broadly than is reasonably necessary to protect legitimate state interests."); *see also Frisby*, 487 U.S. at 484-86 (first identifying the "significant government interest" served by the challenged ordinance, and then explaining that the ordinance "is narrowly tailored" to that interest); *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) (upholding an ordinance that "curtails no more speech than is necessary to accomplish its purpose"); *United States v. Grace*, 461 U.S. 171, 182-83 (1983) (considering a challenged law's apparent purpose as well as an additional justification proffered by the government, and holding that the law did not "substantially" or "sufficiently" serve either purpose); *Berger*, 569 F.3d at 1041 (explaining that this standard requires a reasonable fit between the government's means and ends); *Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 821 (6th Cir. 2005) (upholding an ordinance because "[t]he fit between the City's means and ends is a reasonable one"); *Chesapeake B&M, Inc. v. Harford County, Md.*, 58 F.3d 1005, 1013 (4th Cir. 1995) ("The 'intermediate scrutiny' analysis applicable to content-neutral restrictions on speech . . . is concerned with the ends government can pursue, the means with which it can pursue those ends, and the relationship between them.").

No. 09-30186

## B. Application of Precedents

In determining the constitutionality of the challenged provisions of the SLU speech policy,[30] we must apply intermediate scrutiny, as exemplified by *Knowles*. Thus, the government must (1) identify the significant and legitimate government interests that it asserts as justifying its restrictions on speech, and (2) demonstrate that the SLU policy's speech restrictions are narrowly tailored to further those government interests.

### 1. Identification of Government Interests

In cases like this one, in which speech restrictions at a state university are at issue, the government's legitimate interests undoubtedly include protecting and furthering the university's mission of educating its students. Still, the government must justify its restrictions on speech by showing that they are narrowly tailored to serve specific, legitimate government interests.

"First Amendment rights must be analyzed 'in light of the special characteristics of the school environment,'" as the Supreme Court stated in *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969)).[31] "A university differs in

---

[30] The challenged provisions are quoted in full in the majority opinion. Maj Op. 3-5 nn.1-4. The restrictions that will be addressed here are (1) the requirement that even individuals and small groups must obtain advance permission to speak in public; (2) the requirement that every person who has any role at all in a speech event must entrust various personal information to SLU; (3) the limitation of speech to a maximum of two hours per seven days; and (4) the requirement that would-be speakers must apply for permits seven days in advance.

[31] *See also Hill v. Colorado*, 530 U.S. 703, 728 (2000) ("[I]n determining whether a statute is narrowly tailored, we have noted that '[w]e must, of course, take account of the place

65

No. 09-30186

significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Nonetheless, "[w]ith respect to persons entitled to be there, [the Supreme Court's] cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Id.* at 268-69.[32] Therefore, as we have held in another case involving a state university, "[t]he government bears the burden of establishing that the regulations are reasonable." *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992).

In this case, the defendant government officials have done little to carry their burden to "show affirmatively that [the restrictions are] narrowly tailored to protect [the government's] identified interests." *Id.* at 119. Indeed, at one point in their appellate brief, the defendants appear to be declining to even attempt to do so: "In this case the specific significant State interests of SLU were not in fact yet identified and remain to be determined in the case in chief." Appellees' Br. 12. That is of course an incorrect statement of the law, since the central issue in this appeal is the constitutionality of SLU's speech restrictions, which cannot be determined

to which the regulations apply in determining whether these restrictions burden more speech than necessary.' . . . For example, we have recognized the special governmental interests surrounding schools, courthouses, polling places, and private homes.") (footnotes omitted) (quoting *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 772 (1994)).

[32] The defendants have not argued that Sonnier was not "entitled to be there"; their argument is only that the SLU speech policy, on its face and as applied to Sonnier, is consistent with the First Amendment.

No. 09-30186

without first identifying the legitimate interests that are asserted by the government.

Nonetheless, the defendants' brief does mention some government interests. It states, "as a general principle, the government does have a significant interest in preserving the campuses of public colleges and universities for the use of students." Appellees' Br. 12 (quoting *Justice for All v. Faulkner*, 410 F.3d 760, 770 (5th Cir. 2005)). In other words, "the University has an interest in reserving [its] resources for University community members." Appellees' Br. 15 (quoting *Bowman v. White*, 444 F.3d 967, 982 (8th Cir. 2006) (quoting *ACLU Student Chapter — Univ. of Md., College Park v. Mote*, 321 F. Supp. 2d 670, 681 (D. Md. 2004))). The defendants also assert the need "to plan for exigencies such as crowd control and insurance requirements." Appellees' Br. 15. They argue that "the university as a government entity ha[s] a significant interest in protecting the educational experience of the students in furtherance of its educational mission insuring student safety in fostering diversity." Appellees' Br. 16. And they reiterate that "SLU has a legitimate interest in maintaining sufficient order on its campus so that it may conduct its primary mission of providing an education to its students and preventing unnecessary disruption of the academic learning environment." Appellees' Br. 21.

These asserted state interests may be fairly summarized as (1) maintaining public safety, (2) preventing the disruption of education, (3) conserving the university's resources, and (4) fostering diversity. But the defendants have offered little specific explanation of how any of the challenged provisions of the SLU speech policy are narrowly tailored to serve

67

No. 09-30186

any of these specific interests.  For the reasons that follow, the defendants' arguments fall short of demonstrating that the challenged restrictions on speech are narrowly tailored to serve the identified interests.

## 2. Narrow Tailoring

### a. Permit Requirement for Individuals and Small Groups

According to Sonnier's uncontradicted affidavit, he and a handful of friends simply stood in a pedestrian mall, with Sonnier holding up a sign, and tried to engage in conversation with passersby.  They were peaceable and did not cause any disruption.  Under the precedents of the Fifth Circuit and five other circuits,[33] the First Amendment forbids the government from requiring individuals and small groups, like Sonnier and his friends, to obtain advance permission for public speech and assembly.  Such permit requirements are not narrowly tailored to serve any legitimate government interest.

In *Knowles*, this court recognized that "[o]ther circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."  462 F.3d at 436.[34]  The permit requirement at issue in *Knowles* was

_____

[33] *SEIU v. Houston*, 595 F.3d at 603; *Berger v. City of Seattle*, 569 F.3d 1029, 1039-40 (9th Cir. 2009) (en banc); *Knowles*, 462 F.3d at 436; *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996); *Grossman v. City of Portland*, 33 F.3d 1200, 1206-07 (9th Cir. 1994); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).

[34] The court cited *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996); *Grossman v. City of Portland*, 33 F.3d 1200, 1202-06 (9th Cir. 1994); and *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).  Cases from the Fourth and Sixth Circuits also support the same proposition.  *See supra* note 30.

No. 09-30186

held to be unconstitutional because it made no exception for small groups. Five other circuits have held likewise. The SLU regulation that is at issue in this case does exactly what those precedents forbid — it requires a handful of people to obtain a permit before they can speak in a public place. It is therefore unconstitutional.

There is a good reason why six circuits have agreed that such permit requirements are unconstitutional: the great majority of individuals and small groups exercising First Amendment rights do not block traffic or disrupt classes,[35] whereas the few who actually intend to be disruptive or to interfere with the rights of others are very unlikely to seek advance permission before doing so. Thus, a permit requirement that applies to small groups and individuals can reasonably be expected to accomplish nothing except burdening the speech of law-abiding, non-disruptive people. Such a requirement therefore "burden[s] substantially more speech than is necessary to further the government's legitimate interests," *Ward*, 491 U.S. at 799, and is not narrowly tailored. By contrast, advance permit requirements that apply only to larger groups or to speakers who draw large crowds are far more justifiable, because such groups inherently create logistical problems like traffic and noise that may need to be planned for in advance. *Cf. Bowman v. White*, 444 F.3d 967, 981 (8th Cir. 2006). But because these justifications do

---

[35] *See Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972) ("[I]t would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians."); *cf. SEIU v. Houston*, 595 F.3d at 603 (recognizing that a "careful distinction" between small parades and larger ones "is in accord with principles of narrow tailoring" because small parades have "lesser effects on safety and congestion concerns").

not pertain to small groups, permit requirements that apply to small groups
are not narrowly tailored.

The majority opinion suggests that the requirement of an exception for
small groups, which is well established for municipal ordinances, should not
apply to public universities because "a university is less able than a city or
other entity with police powers to deal with a significant disruption on short
notice." Maj. Op. 13 (quoting *Bowman*, 444 F.3d at 982). But this distinction
is factually inapposite here because SLU — like many public universities —
has a police force. Indeed, this case arose from an interaction between the
plaintiff and a campus police officer.

Moreover, the Fourth and Eighth Circuits have specifically rejected
arguments that in small municipalities with limited resources and small
police forces, public safety justifies requiring individuals and small groups to
obtain advance permission to exercise First Amendment rights. *Cox v. City of
Charleston*, 416 F.3d 281, 285 (4th Cir. 2005); *Douglas v. Brownell*, 88 F.3d
1511, 1523-24 (8th Cir. 1996). There are strong similarities between
campuses and municipalities, as this court recognized in *Hays County
Guardian*: "The campus's function as the site of a community of full-time
residents makes it 'a place where people may enjoy the open air or the
company of friends and neighbors in a relaxed environment,' and suggests an
intended role more akin to a public street or park . . . ." 969 F.2d at 117
(quoting *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 651
(1981)). SLU is a sizable university with around 15,000 students; *Douglas*
involved a municipality with a slightly smaller total population, and *Cox*

No. 09-30186

involved a municipality about one-third as large as SLU.[36] The reasoning of *Cox* and *Douglas* therefore applies to SLU with at least equal force.

The court in *Cox* explained that advance permit requirements are not justified by the speculative possibility that a small group engaging in free speech might do something disruptive: "the City fails to explain how a small demonstration that may become inflammatory would tax its police force any differently than, for example, a street fight between two individuals, so as to justify requiring advance warning of all small demonstrations." 416 F.3d at 285. The court also emphasized that small municipalities can do many other things to meet their public safety goals. They "can enforce ordinances prohibiting and punishing conduct that disturbs the peace, blocks the sidewalks, or impedes the flow of traffic." *Id.* at 286. They "can also pass ordinances that 'regulate only the volume, location, or duration of [protected] expression,' rather than subjecting all speech to a permit requirement." *Id.* (alteration in original) (quoting *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990)). And they can enact permit requirements that "do[] not burden small gatherings posing no threat to the safety, order, and accessibility of streets and sidewalks." *Id.* at 287. SLU, like the small municipalities in *Cox* and *Douglas*, is free to take steps such as

[36] Despite the name of the case, the City of Charleston was not a party to the appeal in *Cox v. City of Charleston*. The appellee was a small municipality called Travelers Rest, South Carolina, which had a population of 4100 in the year 2000. That is less than one-third of the number of students enrolled at SLU. *See* http://travelersrestsc.com/community/ (Travelers Rest population); Appellees' Br. 14 (SLU enrollment).

*Douglas* concerned the City of Clive, Iowa, whose current population is around 14,000. *See* http://www.cityofclive.com/about-clive/. The court rejected the city's argument that its "limited resources and small police force" justified a five-day advance notice requirement for a permit, two days shorter than the advance notice period that is at issue in this case. 88 F.3d at 1523-24.

No. 09-30186

these to further its legitimate interests in maintaining public safety and preventing the disruption of education. Thus, the reasoning of *Cox* and *Douglas* refutes the idea that the size of SLU's police force might justify imposing a permit requirement on individuals and small groups.

The majority opinion cites two cases in support of the view that public universities can impose advance permit requirements on small groups. Maj. Op. 14. However, neither case is actually relevant to that issue. In *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006), the plaintiff was a speaker who drew crowds as large as 200 students. *Id.* at 981. The Eighth Circuit specifically explained that any argument for a small-group exception would be inapposite because the speaker regularly drew such large crowds.[37] Thus, the *Bowman* court had no occasion to even consider whether such a permit requirement would be constitutional if imposed on an individual or a handful of people. If anything, the opinion's emphasis on the size of crowds suggests that the court would have decided the case differently in the absence of Bowman's

---

[37] The *Bowman* court explained:

Bowman argues that the *Thomas* [*v. Chicago Park District*, 534 U.S. 316 (2002)] and *Grossman* [*v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994)] analyses are not applicable to him because he is a single speaker. This argument fails because regardless of whether Bowman is speaking alone or with others, carrying a sign, or handing out literature, he has demonstrated the capacity to attract a crowd and disrupt the unique educational environment. *See* [*ACLU Student Chapter — Univ. of Md., College Park v.*] *Mote*, 321 F. Supp. 2d [670,] 679 [(D. Md. 2004)]. In fact, the majority of Bowman's space reservation requests listed an estimated attendance of between fifty and one hundred people, analogous to the situation in *Thomas*. The actual attendance at his events has run as high as two hundred people. Under these circumstances, the permit requirement is justified to "coordinate multiple uses of limited space," "assure preservation of the [campus]," "prevent uses that are dangerous" to students or other people, and "to assure financial accountability for damage" caused by Bowman's event. *Thomas*, 534 U.S. at 322 . . . .

*Bowman*, 444 F.3d at 981.

No. 09-30186

"demonstrated . . . capacity to attract a crowd." *Id*. at 981.  There is no evidence in the instant case to suggest that Sonnier draws sizable crowds when he speaks; rather, his uncontradicted evidence is that he merely carries signs and attempts to engage individual passersby in conversation.

The majority opinion also relies on *Powe v. Miles*, 407 F.2d 73 (2d Cir. 1968).  In that case, a college took disciplinary action against students who took part in a 16-person demonstration at an ROTC ceremony, in which the demonstrators deliberately interfered with the audience's view of the ceremony.  *Id*. at 77-78.  The Second Circuit's opinion explained that "the suspensions in this case were not bottomed on a failure to furnish notice to the administration" as required by the college's 48-hour advance notice requirement.  *Id*. at 84.  Rather, the demonstrators were suspended for engaging in disruptive civil disobedience.  Thus, the *Powe* case did not actually involve a challenge to a policy requiring permission in advance for speech or assembly; *a fortiori*, the case did not come close to raising the issue of whether such a policy was required to contain an exception for individuals or small groups.

The bottom line is simply that when the government requires every individual or handful of people to seek advance permission before exercising their First Amendment rights in public, it suppresses a far greater amount of speech than is necessary to serve any legitimate governmental purpose.  Occasionally a particular protester may act in a way that interferes with a university's educational functions, but — as the Fourth Circuit said in *Cox* — that is not really different from the occasional outbreak of a fight, an out-of-control party, or another small disturbance.  If the police can handle other

73

No. 09-30186

small incidents of unruly behavior that happen without advance warning, then they are equally capable of handling an occasional disruptive protester or handful of demonstrators without advance warning.  As this circuit and five others have recognized, requiring individuals and small groups to seek advance government permission before speaking in a public place is "too high a cost" because it unnecessarily burdens a substantial amount of peaceful, harmless, constitutionally protected speech.  *Cox*, 416 F.3d at 285 (quoting *Turner*, 893 F.2d at 1392).  Under these precedents, SLU's advance permit requirement is unconstitutional.

### b.  *Other Challenged Restrictions*

The government has also failed to carry its burden to justify the other challenged elements of the SLU speech policy: the requirement that significant personal information be collected from every single participant in an event; the provision limiting speech to no more than two hours per seven days; and the provision requiring seven days' advance notice to obtain a permit.

The SLU speech policy imposes a rather sweeping requirement that personal information, including social security numbers, dates of birth, addresses and phone numbers, be collected from every single individual who has any role at all in a speech event — including people who merely set up equipment, hold signs, or pass out pamphlets.  Such a broad requirement is not necessary to further any legitimate interest that the government has identified.  It is likely that a much narrower version of this policy could be justified under some circumstances: for instance, as the majority opinion

No. 09-30186

states, it would be reasonable for planning purposes (at least for events of any substantial size) for the university to want to know "the identity of speakers on campus, where they intend to speak, and their purpose." Maj. Op. 18. Furthermore, the university has good reason to obtain identifying information from at least one responsible person in order "to assure financial accountability for damage caused by the event." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002). But neither of these considerations, nor any others that have been identified, provide any justification for SLU's much broader and more burdensome requirement that *everyone* involved with an event must entrust their social security numbers and other personally identifying information to SLU officials. The majority opinion does not specifically explain why this requirement should be considered narrowly tailored. If there is no way to justify it as being narrowly tailored, then our court ought to acknowledge that it is simply unconstitutional.

As for the regulation limiting speech to two hours per seven days, it plainly restricts speech far more severely than is necessary to serve the university's legitimate interest in "fostering a diversity of viewpoints and preventing one speaker from monopolizing space." Maj. Op. 16. The same goals could be accomplished just as successfully by a policy that would merely give priority to speakers who had not already spoken for two hours in a given week. Such a policy might have the effect of limiting everyone to two hours if there was a week of extraordinarily high demand for speaking time — but, unlike the policy that is at issue here, it would not purposelessly restrict speakers to two hours even during weeks when there were no competing

75

No. 09-30186

demands for space or time.  The Eighth Circuit made the very same point concerning a similar restriction in *Bowman*:

> The University's interest in fostering a diversity of viewpoints and avoiding the monopolization of space serves a significant interest.  However, the five-day cap is not sufficiently narrowly drawn to achieve that interest.  The Policy as written does not by itself foster more viewpoints; it merely limits Bowman's speech. If no one else wants to use the space after Bowman has used his five permits, the space will go unused even if Bowman still wants to use the space.  A more narrowly tailored policy might grant Bowman more than just five days per semester to speak if the space is not being used, but give preference to other speakers who have not already obtained five permits.

444 F.3d at 981-82.  The SLU policy restricts a speaker's speech to one two-hour block per week (32 hours per semester), rather than the five eight-hour blocks (40 hours) per semester in *Bowman*, *id.* at 981, but the *Bowman* court's logic applies equally well.  The SLU policy, like the policy in *Bowman*, "does not by itself foster more viewpoints; it merely limits [Sonnier's] speech." *Id.*  Because this restriction is no more effective at serving legitimate government interests than a much less restrictive alternative policy would be, it is not narrowly tailored.

Finally, the SLU speech policy requires all speakers to apply for permits seven days in advance.  The majority opinion defends this advance notice requirement as being necessary to allow the university to prepare for events involving large numbers of people, or to allow SLU administrative staff to arrange their own schedules so that they can attend events.  But there is no reason why a few people holding signs on a street corner, or a street preacher trying to converse with passersby about the Bible, would require SLU to engage in anything close to seven days of logistical

No. 09-30186

preparation. Nor is it realistic to suppose that the University would expend its resources by having an administrator rearrange his or her schedule to spend hours watching a small group or an individual street preacher, when campus police officers can see that the peace is kept as part of their regular jobs. If the small group of anti-abortion speakers in *Knowles* could not be subjected to an advance permit requirement for security or logistical reasons, then there is likewise nothing justifying the imposition of a permit requirement on the speakers in this case.

The seven-day notice requirement that is challenged in this case might perhaps be narrowly tailored if it applied only to large groups, but there appears to be no case that even comes close to saying so; a seven-day notice period is more than twice as long as the three-day notice period that was upheld in *Bowman* for a speaker who drew as many as 200 people. Therefore, I would avoid deciding whether a seven-day notice period would be too long to be justifiable if it applied only to large groups. Instead, I would simply conclude that it is unconstitutional as applied to individuals and small groups.

*          *          *

In summary, I respectfully dissent from the majority's decision not to hold unconstitutional, as applied to the plaintiff's speech, the governmental restrictions on speech that are at issue in this case (except for the security fee provision, which I agree is unconstitutional). I do so for three reasons: first, this appeal properly involves an as-applied challenge as well as a facial one; second, regardless of whether this suit involves a facial or as-applied challenge or both, the constitutional test that must be applied to these speech

77

No. 09-30186

restrictions is intermediate scrutiny, not the "no set of circumstances" test; and finally, the government has failed to show that the challenged speech restrictions are narrowly tailored to serve any legitimate governmental interest.